2009 VT 19

# In re Amended Petition of UPC Vermont Wind, LLC, for a Certificate of Public Good, Pursuant to 30 V.S.A. § 248, et al. (Ridge Protectors, Inc., Appellant)

[969 A.2d 144]

No. 07-456

Present: Reiber, C.J., Dooley, Skoglund and Burgess, JJ., and Gibson, J. (Ret.), Specially Assigned

Opinion Filed February 6, 2009

*C. Daniel Hershenson* of *Hershenson, Carter, Scott & McGee, PC*, Norwich, and *Anthony Z. Roisman* of *National Legal Scholars Law Firm, P.C.*, Lyme, New Hampshire, for Appellant.

*John J. Cotter*, Montpelier, for Appellee Department of Public Service.

*Ronald A. Shems, Andrew Raubvogel, Geoffrey H. Hand* and *Karen Tyler* of *Shems Dunkiel Kassel & Saunders PLLC*, Burlington, for Appellee UPC Vermont Wind, LLC.

¶ 1. **Burgess, J.** In this appeal, we consider whether the Vermont Public Service Board erred in issuing a certificate of public good (CPG) to UPC Vermont Wind, LLC, for a wind generation facility in Sheffield, Vermont. Citizen action group Ridge Protectors, Inc. challenges the Board's evaluation of several statutory factors necessary to the issuance of a CPG. We reject Ridge's arguments and affirm the Board's decision.

¶ 2. Before turning to the merits, we emphasize the limited nature of our review. When the Board evaluates a petition for a CPG under 30 V.S.A. § 248, it is engaging in a "legislative, policy-making process." *In re Vt. Elec. Power Co.*, 2006 VT 69, ¶ 6, 179 Vt. 370, 895 A.2d 226 (quotation omitted). The Board must exercise its discretion "to weigh alternatives presented to it, utilizing its particular expertise and informed judgment." *Id.* (quotation omitted). We give "great deference" to the Board's expertise and judgment and "accord a strong presumption of validity to the Board's orders." *Id.* (quotation omitted). We will affirm the Board's findings unless they are clearly erroneous, and an appellant bears a heavy burden of demonstrating clear error. *Id.* (citation omitted); see also *In re Citizens Utils. Co.*, 171 Vt. 447, 450, 769 A.2d 19, 23 (2000) (Supreme Court accepts Board's findings and conclusions unless appealing party demonstrates that they are clearly erroneous; in reviewing those findings and conclusions, Supreme Court defers to Board's particular expertise and informed judgment).

¶ 3. With this standard in mind, we briefly review the underlying proceedings. UPC sought a CPG allowing it to construct a sixteen-turbine, forty-megawatt wind-generation facility in Sheffield. The project would be located high on a ridgeline, with rotors 315 feet in diameter on towers 262 feet high. Each tower would have a sixteen-foot diameter at its base and taper to nine feet in diameter just below the nacelle, which houses the main mechanical components of the turbine. With the blade tip in vertical position, the total height would be approximately 420 feet. The project's expected annual energy production would meet the energy demand of over 15,000 homes, equivalent to about 45% of households in northeastern Vermont, and UPC proposed to sell the energy it generated to Vermont utility companies.

¶ 4. Following three public hearings and a ten-day evidentiary hearing, the Board issued a lengthy written opinion granting the CPG. In reaching its conclusion, the Board recognized that the project would have some negative impact on aesthetics, among other considerations, but concluded that these impacts would not be unduly adverse. It also found that the project would provide economic benefits to the state and that it would contribute to meeting a need for renewable power. Ultimately, the Board found that UPC's proposal, with appropriate conditions, satisfied the statutory requirements set forth in 30 V.S.A. § 248, promoted the general good, and thus should receive a CPG. The CPG was subject to a continuing requirement, however, that UPC make a good faith effort to enter into fixed-priced contracts with Vermont utilities, in preference to variable market rate contracts, reflective of its sustainable and no-cost fuel source. The Board ordered UPC to submit such stably priced contracts for its approval prior to commencement of construction, or show cause why this condition should be modified or cancelled. Ridge appealed from the Board's decision, challenging the Board's evaluation of several of the specific statutory criteria necessary to the issuance of a CPG. See 30 V.S.A. § 248(b) (identifying findings that Board must make before issuing a CPG).

## I. Economic Benefit under 30 V.S.A. § 248(b)(4)

¶ 5. Ridge first contends that the Board failed to find that the project would result in an "economic benefit to the state and its

residents" as required by 30 V.S.A. § 248(b)(4).[1] According to Ridge, the Board found that the project would result in an economic benefit only if UPC could successfully negotiate stably priced contracts to sell its power. Ridge challenges this "conditional" approval, arguing that it is inconsistent with 30 V.S.A. § 248(b), case law, and Board precedent. Ridge maintains that given what it characterizes as the Board's finding of an insufficient economic benefit under 30 V.S.A. § 248(b), the CPG should have been denied.

¶ 6. Ridge misconstrues the Board's order, and its claims of error are without merit. The Board repeatedly and expressly found that the project would result in an economic benefit to the state and its residents. As explained by the Board, the project would create new jobs, increase tax revenue, generate substantial lease payments to the owners of the land on which the project was located, and draw on local sources for construction materials. It would also result in significant tax and mitigation payments to the Town of Sheffield, as well as confer a benefit on all ratepayers in New England. Although ultimately directing UPC to attempt even better terms for Vermont utilities in its power sales contracts, the Board noted that at least one power purchase contract would supply UPC power to a major Vermont utility at less than market rates, and that UPC planned for all project output to be sold to Vermont retail electric utilities. The Board specifically concluded that, "although stably priced contracts would be preferable, the Project nevertheless provides sufficient economic benefit to the state to satisfy Section 248 (b)(4)."

¶ 7. Bypassing these particular findings and conclusions, Ridge instead focuses on the Board's more general discussion of economic benefit and promotion of overall public good. See 30 V.S.A. § 248(a)(2)(B) (Board must find that project "will promote the general good of the state" as prerequisite to CPG authorizing commencement of construction of electric transmission or generation facility). The "general good of the state," considered under § 248(a)(2)(B), is a broader concern than the call for some, albeit possibly limited, positive impact amounting to "an economic ben-

---

[1] We note that Ridge was granted permission to intervene only with respect to the following issues: the orderly development of the region, the economic impact of the project, aesthetics and other environmental issues, and impact on outstanding resource waters.

efit" required by § 248(b)(4). As the Board explained, while it was able to make positive findings under each of the § 248 criteria, the ultimate question to be resolved was whether the project promoted the general good of the state.

¶ 8. The Department of Public Service argued below that the project would not provide sufficient benefit to the state without stably priced contracts, and that the CPG should therefore be conditioned on UPC securing such contracts. The Board agreed that such contracts were beneficial, but it refused to deny the CPG in the absence of such contracts. Instead, it approved the CPG with the condition that UPC make "all reasonable efforts" to enter into diverse, long term, stably priced contracts with Vermont utilities. The Board indicated that it would reexamine this condition if UPC was unable to obtain such contracts.

¶ 9. The Board plainly found sufficient evidence to warrant positive findings under each of the statutory criteria, and found the evidence sufficient to warrant a CPG. The Board's determination that "the general good will not be promoted" unless approval of the project was conditioned upon "the requirement that UPC make further efforts to enter into stably priced contracts with the Vermont utilities" does not detract from its explicit finding that the project demonstrated economic benefits as required by § 248(b)(4). The promotion of the general good of the state can plainly encompass the potential for even greater economic benefit from taking advantage of a particular efficiency, such as a sustainable no-cost fuel source, as envisioned by the Board's decision.

¶ 10. Moreover, given the project's "not insignificant impacts," it was fully within the Board's § 248(a)(2)(B) purview to condition approval on UPC making further efforts to exploit its advantage to reach stably priced contracts for the sale of electricity insulated from market fluctuations so as to enhance the project's benefit to the utility ratepayers at large. In imposing this requirement, the Board did not ignore a "substantive issue mandated by statute for consideration," as Ridge asserts. Instead, it fulfilled its statutory mandate, finding that the project, with conditions, satisfied the applicable statutory requirements, provided benefits greater than its adverse impacts, and, accordingly, promoted the general good of the state. The Board acted within its discretion in using post-certification proceedings to evaluate

UPC's compliance with the conditions imposed. See *In re Vt. Elec. Power Co.*, 131 Vt. 427, 435, 306 A.2d 687, 692 (1973) (stating that use of post-certification proceedings is "an accepted practice of the Board and administrative tribunals generally"). Ridge's fear that it will be denied an opportunity to meaningfully participate in any post-judgment proceedings is premature. We are mindful that Ridge was granted only limited intervention in this case, but Ridge acknowledges that it will have the opportunity to comment on the post-judgment materials submitted by UPC, and there is nothing in the record that would preclude the Board from holding additional hearings should it find them necessary. See *id.* (expressing similar sentiment).

▌ ¶ 11. We do not address Ridge's argument, raised for the first time in its reply brief, that the Board did not adhere to § 248(b)(4) because it failed to determine the precise extent of economic benefit to the state. See *Robertson v. Mylan Labs., Inc.*, 2004 VT 15, ¶ 1 n.2, 176 Vt. 356, 848 A.2d 310 (arguments raised for first time in reply brief need not be considered); see also *Gallipo v. City of Rutland*, 2005 VT 83, ¶ 52, 178 Vt. 244, 882 A.2d 1177 (issues not raised in original brief may not be raised for first time in reply brief). We note, in passing, that this argument finds no support in the plain language of the statute. See *In re Twenty-Four Vermont Utils.*, 159 Vt. 339, 361, 618 A.2d 1295, 1308 (1992) (where the meaning of statute is plain on its face, Court must apply it according to its terms). Section 248(b)(4) requires that the Board find only that the project "will result in an economic benefit to the state and its residents," a finding that the Board expressly made here. The extent of the economic benefit is one consideration among many that the Board must weigh while engaged in the "legislative, policy-making process" necessary to the issuance of a CPG. *Vt. Elec. Power Co.*, 2006 VT 69, ¶ 6.

## II. Orderly Development of the Region under 30 V.S.A. § 248(b)(1)

¶ 12. Ridge next challenges the Board's finding that the project would not "unduly interfere" with orderly growth in the region. See 30 V.S.A. § 248(b)(1). Ridge maintains that the Board misapplied the relevant legal standard, and that it misread and misap-

plied the applicable regional plan.[2] According to Ridge, there is no evidence to support the Board's findings that the project would "impact only one small part of the region," or that the regional plan "specifically recognizes that commercial scale wind energy 'needs to be considered as a resource.'" Ridge maintains that the evidence supports conclusions opposite to those reached by the Board.

¶ 13. We find no error. Section 248(b)(1) requires the Board to find that the project "will not unduly interfere with the orderly development of the region with due consideration having been given to the recommendations of the municipal and regional planning commissions, the recommendations of the municipal legislative bodies, and the land conservation measures contained in the plan of any affected municipality." The Board applied the appropriate standard, and its finding that the project complied with § 248(b)(1) is supported by the evidence.

¶ 14. As recounted by the Board, the project would be located in the Northeast Kingdom region, encompassing Caledonia, Essex and Orleans counties. The 2006 regional plan divided land use in the region into five broad categories and provided "development pattern descriptions" for each category. The plan stated that these descriptions were "general in nature," and could be used "to guide growth in an appropriate manner, keeping in the character of the area." UPC's project would be located within a "Rural Area," and the plan indicated that most of the region's land fell within this category. The regional plan described rural areas as receiving "very little commercial or industrial development unless it occur[red] in an established industrial park, in an area specifically designated in the local zoning bylaw, or occur[red] in an appropriate scale for its rural surroundings."

¶ 15. The Board recognized that commercial wind development was inconsistent with the plan's description of traditional land use in a "rural area." At the same time, given that most of the land in the region was designated as rural and that this project would affect only a small portion of that area, the Board found that this inconsistency did not compel a conclusion that the plan prohibited these types of facilities. Indeed, the Board continued, the regional

---

[2] Ridge states that the Board erred in finding that the 2006 regional plan did not apply. Ridge acknowledges, however, that the Board did in fact evaluate the project's consistency with the 2006 regional plan, making any error harmless.

plan expressly recognized that wind energy needed to be considered as a resource to meet the region's current and future energy needs. The plan also acknowledged that there were "significant, legitimate issues surrounding commercial-scale wind generation," and requested that the Board consider several specific criteria when reviewing large-scale wind projects.

¶ 16. In a related vein, the plan indicated that towns within the region "may take positions on wind energy facilities which may be at significant variance with each other." The Board found that the plans of other towns besides Sheffield were useful in identifying these towns' concerns about development within their boundaries, but they were not controlling of the development within the region or development in other towns. Although the project would be visible in neighboring towns, the Board continued, the intrusion into the scenic landscape would not rise to a level that interfered with the orderly development of the neighboring towns or region. The Board noted, moreover, that the turbines would be located exclusively in Sheffield. For these and other reasons, the Board found that the project satisfied § 248(b)(1).

¶ 17. Ridge fails to demonstrate that the Board erred in reaching this conclusion. Ridge appears to suggest that the Board was required to find that the project strictly adhered to the regional plan. Under the plain terms of the statute, however, the Board need only give "due consideration" to the recommendations of the municipal and regional planning commissions in deciding if the project "will not unduly interfere with the orderly development of the region." 30 V.S.A. § 248(b)(1); see also *Vt. Elec. Power Co.*, 2006 VT 69, ¶ 25 ("[T]his Court has construed the phrase 'due consideration' in § 248(b)(1) to 'at least impliedly postulate[] that municipal enactments, in the specific area, are advisory rather than controlling.'" (quoting *City of S. Burlington v. Vt. Elec. Power Co.*, 133 Vt. 438, 447, 344 A.2d 19, 25 (1975))). It is evident that the Board did so here.

¶ 18. As indicated above, the Board considered Ridge's arguments and rejected them. The Board acknowledged that the project was inconsistent with some provisions in the regional plan, but found that the plan did not prohibit the project and, in fact, it encouraged development of wind power. The plan explicitly declared that "[w]ind energy needs to be considered as a resource to meet some of [the region's] current and future needs." While

Ridge argues that this statement does not refer to commercial-scale wind development, the regional plan reflects quite the opposite. Directly following the above declaration, the plan acknowledges the "significant, legitimate issues surrounding commercial-scale wind generation," and recommends that the Board consider certain additional criteria when conducting its review of a commercial wind project proposed under § 248.[3]

¶ 19. Ridge is similarly incorrect in suggesting that the regional plan prohibits the development of commercial-scale wind energy. In addition to the language quoted by the Board above, the regional plan includes as part of its regional energy goals and strategies: providing an adequate, reliable, and secure energy supply to meet the region's needs; encouraging a. diversified energy portfolio; encouraging ISO-New England to address the grid's dependence on natural gas; and assisting in the development of businesses that support alternative energy use. Development of commercial-scale wind energy is not inconsistent with these goals. Similarly, the plan does not "exclude" development that is incompatible with existing land uses, as Ridge asserts. Rather, it provides that new development "should be" compatible with existing land uses and that it "should" follow traditional development patterns. These recommendations are not equivalent to a mandate.

¶ 20. Moreover, it was not unreasonable for the Board to find that the project would affect only a small portion of the land designated as rural under the regional plan. The Board recognized that the project would be visible in towns beyond Sheffield, and that it would have an effect on these municipalities. Even assuming that this means the project would have a "substantial regional impact," as defined by the plan and as argued by Ridge, it does not necessarily follow that the project therefore will unduly interfere with the orderly development of the region. Indeed, the Board expressly found that the project's intrusion into the scenic

---

[3] The Board did not totally disregard these criteria, as Ridge contends, but rather, found the criteria addressed in various portions of its decision. The plan requested consideration of regional and municipal plans and zoning, comparative benefits and burdens to host and neighboring towns, decommissioning and aesthetics. These concerns were substantially addressed throughout the Board's analyses of general good, economic benefit, environmental impact and aesthetics under § 248(a) and (b), and its determination that the project was consistent with the plan.

landscape would not rise to a level that interfered with the orderly development of the neighboring towns or region.[4]

¶ 21. Ridge essentially asks this Court to reconsider the evidence and reach a conclusion opposite to that reached by the Board. This we will not do. It is for the Board, not this Court, to weigh the evidence and assess the credibility of witnesses. See, e.g., *In re Cent. Vt. Pub. Serv. Corp.*, 167 Vt. 626, 627, 711 A.2d 1158, 1160 (1998) (mem.) (Supreme Court will not reweigh the evidence or reassess credibility of witnesses). The Board acted well within its discretion in weighing the evidence, and we find no error.

### III. Aesthetic Impact under 30 V.S.A. § 248(b)(5)

¶ 22. Ridge next challenges the Board's consideration of the aesthetic impact of the project under 30 V.S.A. § 248(b)(5). Ridge first argues that the Board failed to make adequate findings to support its decision. It also challenges the substance of the Board's decision, arguing that, contrary to the Board's conclusions, the project violates a clear written community standard and will be aesthetically shocking and offensive to the average person. Ridge further complains that there were essentially no mitigation measures taken by UPC.

¶ 23. These arguments are without merit. Pursuant to § 248(b)(5), the Board must find, in pertinent part, that a project "will not have an undue adverse effect on esthetics . . . with due consideration having been given to the criteria specified in 10 V.S.A. § 1424a(d) and § 6086(a)(1) through (8) and (9)(K)." As discussed below, the Board engaged in the appropriate analysis, it made sufficient findings to support its decision, and its findings are supported by the record. We therefore uphold its determination.

¶ 24. In determining whether the project would have an undue adverse aesthetic impact under § 248(b)(5), the Board employed the so-called *Quechee* test. Under this test, developed in connection with Act 250 proceedings, a factfinder first examines

---

[4] Ridge also posits that the Board failed to comply with § 248(b)(1) by denying the Northeastern Development Association's request to intervene and by "ignoring" the Sutton town plan. Even assuming, arguendo, that Ridge has standing to raise these issues, the arguments are raised for the first time in Ridge's reply brief; therefore, we do not address them. *Robertson*, 2004 VT 15, ¶ 1 n.2.

whether a project will have an adverse impact on scenic and natural beauty, and if so, whether the impact will be "undue." *In re Times & Seasons, LLC*, 2008 VT 7, ¶ 8, 183 Vt. 336, 950 A.2d 1189. An adverse impact is considered undue if: (1) it violates a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area; or (2) it offends the sensibilities of the average person; or (3) the applicant has failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings. *Id.*

¶ 25. Because it was undisputed that UPC's project would have an adverse aesthetic impact, the Board focused its analysis on whether the negative effect would be undue. It first considered an argument raised by the Town of Sutton, which asserted that the regional plan contained clear written community standards that would be violated by the project. According to the town, the regional plan identified the area surrounding the project as a "rural area" where there should be "very little commercial or industrial development, unless it occur[red] in an established industrial park, in an area specifically designated in the local zoning bylaw." The town also cited several provisions providing that development in the area should be compatible with existing land uses and development patterns. UPC and the Department argued, in contrast, that the regional plan contained general language that did not constitute a clear, written community standard.

¶ 26. The Board agreed with UPC and the Department and found that the regional plan contained no explicit community standards with which the project would clash. The Board explained that to be considered a clear, written community standard, there must be language " 'intended to preserve the aesthetics or scenic beauty of the area' where the proposed project is located and [it] must apply to specific resources in the proposed project area." In this case, the project would not impact any particular scenic areas specified for preservation by the regional plan. Instead, the plan referred to "rural area" districts constituting large portions of the Northeast Kingdom and recommended that there be little development in such areas. The regional plan also stated that development should be compatible with existing land uses, without specifying scenic resources to be protected. The

Board found these provisions insufficient to constitute a clear written community standard.[5]

¶ 27. The Board next considered if the project would be shocking or offensive to the average person. The Board recognized that scenic qualities of the area were important to its residents and that there would always be some resistance to any change in the landscape. It reasoned, however, that the *Quechee* test did not guarantee that the aesthetic qualities of an area would not change. It found that the majority of the views of the project were not the focus of the locality involved, or were from a distance such that the size of the project would not be overwhelming. Viewed from such distances, the Board concluded that the average person would not find the scale of the project shocking or offensive.

¶ 28. Finally, the Board considered whether UPC had taken generally available mitigating steps that a reasonable person would take to improve the harmony of the project with its surroundings. The Board found that it was impossible to entirely screen the 420-foot wind turbines and consequently mitigate the visibility of the project. Nonetheless, found the Board, UPC did take steps, including painting the proposed turbines to blend more easily with the sky, siting the project near an existing transmission line, and placing the turbines, access roads, collector lines, and substation so as to minimize visual intrusion by the project. The Board thus concluded that the project's adverse aesthetic impact would not be undue.

### A. Procedural Claim

¶ 29. Ridge asserts that the Board failed to make adequate findings to support its decision. While Ridge maintains that many of the Board findings are actually conclusions, it identifies only one such finding — the Board's statement that "the view of the project from Interstate 91 would not be unduly adverse."[6] Ridge also argues that the Board's conclusion concerning the regional plan is unsupported by any findings.

---

[5] In reaching its conclusion, the Board declined to evaluate the project with reference to the Sutton town plan, finding that the Sutton plan was not applicable beyond the town's borders. To the extent that the Board examined clear, written community standards for areas outside of the host town, the Board explained that it looked to the regional plan.

[6] Ridge fails to identify the remaining six findings that it challenges, and we therefore do not address them. *In re S.B.L.*, 150 Vt. 294, 297, 553 A.2d 1078, 1081 (1988) (appellant bears burden of demonstrating how the lower court erred

¶ 30. These arguments are without merit. As we have often stated, "[t]he purpose of findings is to provide a clear statement as to what was decided and why." See, e.g., *Coty v. Ramsey Assocs.*, 149 Vt. 451, 460, 546 A.2d 196, 202-03 (1988) (quotation omitted). Even if the single finding identified by Ridge is construed as conclusory, the Board made numerous additional findings that support its conclusion regarding the aesthetic impact of the project. It found, for example, that there would be limited views of the project from most of the major public roads in the area. It also found that in those places where the project would be visible from the road the visibility would be intermittent and limited due to vegetative screening along the roads and the speed of the vehicles. These findings support a conclusion that the view of the project from Interstate 91 would not be unduly adverse.

¶ 31. Moreover, the Board analyzed in detail whether the adverse aesthetic of the project would be undue under the *Quechee* test. In doing so, it considered whether the views of the project would be offensive to the average person, and also considered whether the provisions of the regional plan advanced by the Town of Sutton contained a "clear written community standard." Unlike the cases cited by Ridge, there can be no doubt here as to what the Board decided and how it reached its decision, which is the purpose of findings of fact and conclusions of law. See *In re Vill. of Hardwick Elec. Dep't*, 143 Vt. 437, 444-45, 466 A.2d 1180, 1184 (1983) (upholding sufficiency of Board's findings where Board's decision "left no doubt as to what it decided and how its decision was reached, thus fulfilling the purpose of findings of fact and conclusions of law"). Cf. *In re Buttoph*, 138 Vt. 573, 575, 420 A.2d 859, 861 (1980) (Water Resources Board erred where it failed to make any findings whatsoever on two statutorily mandated issues); *New England Power Co. v. Town of Barnet*, 134 Vt. 498, 506, 367 A.2d 1363, 1368-69 (1976) (trial court erred by merely reciting testimony presented without indicating credence placed upon the testimony or the extent to which the testimony influenced its decision). We thus reject this claim of error.

---

warranting reversal, and Supreme Court "will not comb the record searching for error").

## B. Substantive Challenge

¶ 32. Turning to the substance of the Board's decision, Ridge argues that, in reaching its conclusion, the Board disregarded its own precedent and that of the Environmental Board. Ridge maintains that the project will be grossly out of character with the natural scenic surroundings, it will significantly diminish the aesthetic qualities of the area, and it will be visually shocking and offensive. In support of its argument, Ridge cites the competing evidence that it presented at the hearing. Ridge also argues that UPC offered essentially no mitigation steps and that the Board erred in accepting UPC's minimal mitigation efforts.

¶ 33. All of these arguments turn on the Board's assessment of the weight of the evidence and the credibility of the witnesses, a role reserved exclusively for the Board. As reflected above, the Board considered the evidence presented on the aesthetic impact of this project, it made findings about how the project would be viewed by the public, and it concluded that the average person would not be shocked or offended by it. As the Board explained, its findings were based on visual simulations presented at the hearing as well as viewshed analyses, which demonstrated to the Board that the majority of the views of the project were from a distance such that its size would not be overwhelming and, consequently, that the average person would not find its observation shocking or offensive.

¶ 34. Ridge cites numerous Environmental Board decisions to support its assertion that the Public Service Board misjudged the evidence before it. Relying on cases where the Environmental Board has found a project "so out of character with its surroundings as to be shocking," Ridge asserts that the Public Service Board should have reached a similar conclusion here. The cases cited by Ridge do not stand for the proposition that every project "out of character" with its surroundings must be deemed to have an undue adverse aesthetic impact. As previously discussed, the Board here found, based on its evaluation of the evidence, that this project would not be shocking or offensive to the average person. While the project may be seen as "out of character" with the surrounding area, the Board reasoned that the views of the project would be intermittent and from such a distance that they would not shock or offend the average person.

¶ 35. It is elemental that each case turns on its own facts, and as we have explained, "[d]etermining the degree of

adverse aesthetic effect is a matter of weighing of the evidence, a role for the Board rather than for this Court." *In re Denio*, 158 Vt. 230, 239, 608 A.2d 1166, 1171 (1992). The Board applied the appropriate standard in evaluating the aesthetic impact of this project; its conclusion is supported by its findings, and its findings are supported by the record. Given this, we will not disturb the Board's assessment of the weight of the evidence on appeal. See *In re Cent. Vt. Pub. Serv. Corp.*, 167 Vt. at 627, 711 A.2d at 1160 ("When conflicting or . . . imperfect evidence is admitted, it is not our province to reweigh such evidence, or reassess its credibility.").

¶ 36. Under the same standard of review, the Board also weighed the evidence as to UPC's mitigation efforts. While Ridge characterizes these efforts as "minimal," the Board concluded otherwise. It made numerous findings in support of its decision, set forth above. These findings are supported by the record, and they support the Board's conclusion that the project satisfied the third prong of the *Quechee* test.[7]

¶ 37. Finally, we note that Ridge also argues that the regional plan contains a clear written community standard. Even assuming that Ridge preserved this claim of error and that it has standing to raise this argument on appeal, we find the argument without merit. The Board properly concluded that the provisions of the regional plan identified by the Town of Sutton were not sufficiently specific to constitute a clear written community standard that would prohibit the development at issue here.

■ ¶ 38. As the Board explained, to satisfy this standard, a provision must be "intended to preserve the aesthetics or scenic beauty of the area" where the proposed project is located and must apply to specific resources in the proposed project area. The plan here did not identify any particular scenic area for preservation that would be affected by the project. Instead, it recommended that there be limited development in the "rural area" districts that made up large portions of the Northeast Kingdom, and stated that development "should be" compatible with existing land use. Unlike the provisions at issue in the Environmental Board cases upon which Ridge relies, these general statements of

---

[7] We do not address Ridge's argument, raised for the first time in its reply brief, that the Board erred by applying an unauthorized "societal benefits" balancing test in its evaluation of § 248(b)(5). *Robertson*, 2004 VT 15, ¶ 1 n.2.

preferred, rather than mandated, objectives are far too open-ended to constitute a clear, community written standard that would put UPC on notice that its project was prohibited. The Board did not err in its evaluation of § 248(b)(5), and we find no grounds to disturb its conclusion that the project satisfied this statutory requirement.

¶ 39. As we stated at the outset, the Board is afforded much discretion in evaluating the benefits and drawbacks of a petition for a CPG under 30 V.S.A. § 248, and this Court gives great deference to its decision. *Vt. Elec. Power Co.*, 2006 VT 69, ¶ 6. It is evident that the Board properly exercised its discretion here, weighing the alternatives presented to it and "utilizing its particular expertise and informed judgment." *Id.* (quotation omitted). We find no basis to disturb its conclusion that this project, with appropriate conditions, complies with the statute and promotes the general good of the state, and thus, is entitled to a CPG.

*Affirmed.*