NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 77

No. 2019-078

| | |
|---|---|
| In re Application of Derby GLC Solar, LLC | Supreme Court |
| | On Appeal from Public Utility Commission |
| | September Term, 2019 |

Anthony Z. Roisman, Chair

David G. Carpenter of Facey Goss & McPhee P.C., Rutland, for Appellant.

Alexander W. Wing, Special Counsel, Department of Public Service, Montpelier, for Appellee State.

Owen J. McClain of Sheehey Furlong & Behm P.C., Burlington, for Appellee Green Mountain Power Corporation.

Joslyn L. Wilschek of Wilschek Iarrapino Law Office, PLLC, Montpelier, for Appellee Vermont Electric Cooperative, Inc.

Ronald A. Shems of Tarrant, Gillies & Richardson, Montpelier, for Amicus Curiae Washington Electric Cooperative, Inc.

PRESENT: Robinson, Eaton and Carroll, JJ., and Dooley, J. (Ret.), and Pearson, Supr. J. (Ret.), Specially Assigned

¶ 1. **EATON, J.** Applicant Derby GLC Solar, LLC appeals the decision of the Public Utility Commission (PUC) denying its application for a certificate of public good (CPG) for a net-metered solar electric-generation facility. The PUC determined that applicant's proposed project failed to satisfy 30 V.S.A. § 248(b)(7) or (10). Applicant contends that the PUC erred by not weighing the alleged economic benefits of the project against its adverse impacts, improperly

considered evidence that should not have been admitted, misinterpreted the language of § 248, and treated applicant's project differently than similarly situated projects. We affirm.

¶ 2. A developer of a new electric-generation facility in Vermont may not begin construction until the PUC determines that the proposed project "will promote the general good of the State and issues a certificate to that effect." 30 V.S.A. § 248(a)(2)(B). To issue a CPG, the PUC must find that the project will meet the eleven criteria set forth in § 248(b), including that the project:

> (4) Will result in an economic benefit to the State and its residents.
>
> . . .
>
> (7) [I]s in compliance with the electric energy plan approved by the Department under section 202 of this title, or that there exists good cause to permit the proposed action.
>
> . . .
>
> (10) [C]an be served economically by existing or planned transmission facilities without undue adverse effect on Vermont utilities or customers.

30 V.S.A. § 248(b). Pursuant to the net-metering statute, 30 V.S.A. § 8010(c)(3), the PUC has conditionally waived these and certain other § 248(b) criteria for net-metering projects. Public Utility Commission, Construction and Operation of Net Metering Systems, § 5.111, Code of Vt. Rules 30 000 5100, http://www.lexisnexis.com/hottopics/codeofvtrules.

¶ 3. In March 2017, applicant applied for a CPG to construct and operate a 500-kilowatt (kW) group net-metered solar photovoltaic electric-generation facility on a reclaimed portion of a sand and gravel pit in Derby, Vermont. Applicant provided notice to all required entities, including the Department of Public Service, Vermont Electric Cooperative, Inc. (VEC), and Green Mountain Power Corporation (GMP). The project would be located in VEC's service territory and was expected to operate for twenty-five years.

2

¶ 4.    VEC and the Department filed comments raising concerns about the project and requested a hearing.  In September 2017, the hearing officer granted the requests for a hearing and rescinded the conditional waivers for 30 V.S.A. § 248(b)(4), (7), and (10).  After conducting a prehearing conference and a site visit, in January 2018, the hearing officer asked applicant to prefile additional testimony concerning § 248(b)(4), (7), and (10).  In June 2018, the PUC issued an order announcing that the full Commission would conduct the evidentiary hearing.  The hearing took place over two days in August 2018.  Following the hearing, the PUC directed the parties to file comments regarding whether the matter should be stayed pending a potential generic proceeding[1] to address the impacts of net-metering projects located in the proposed area for the project.  The PUC subsequently concluded that applicant's case would not be stayed and no generic proceeding would be initiated, and set forth a final briefing schedule.  After the parties filed final briefs, the PUC issued a decision on January 24, 2019 denying the application.

¶ 5.    The PUC made the following findings in its decision.  The proposed project would be within the Sheffield-Highgate Export Interface (SHEI).  The SHEI is a largely rural area along the Canadian border in northern Vermont where the electrical transmission system is frequently constrained.  Output from existing energy generators often exceeds local demand for electricity, and the transmission lines leading out of the area lack sufficient capacity to transport the excess power without jeopardizing the reliable operation of the electrical grid.

¶ 6.    In 2013, ISO New England, the entity that serves as the independent system operator for New England's bulk electric power generation and transmission system, demarcated the SHEI and established generator operation limits to ensure that the transmission system continued to function reliably.  When these limits are reached, large energy generators in northern

---

[1] The PUC occasionally initiates generic investigations in order to avoid repetitive filings and simplify the administrative process.  See, e.g., Generic Investigation into the Implementation by the Utilities of Act H.832—Weatherization Tax, No. 5434, 1990 WL 666756 (Vt. Pub. Serv. Bd. July 3, 1990) (opening generic investigation into proper implementation of new state tax).

Vermont that sell power in the regional energy markets are required to reduce, or "curtail," their output because the transmission system lacks capacity to export the power. In addition, they receive lower prices for the energy they do produce. "Large" generators have a capacity of five megawatts (MW) or more.

¶ 7. In 2016, ISO New England amended its rules to apply these limits to renewable energy generators. As a result, during times when the SHEI is export-constrained, large renewable energy generators in northern Vermont receive lower prices for the electricity they produce and, at the same time, are directed to curtail their output. This rule is known as the "Do-Not-Exceed" dispatch rule.

¶ 8. The SHEI includes several large renewable energy generators, including the 63-MW Kingdom Community Wind project, the 40-MW Sheffield Wind project, and the 27-MW Sheldon Springs hydroelectric project. These generators sell their energy output in the ISO New England regional electricity market. Kingdom Community Wind—— an array of twenty-one wind turbines sited on Lowell Mountain and adjacent ridgetops in Lowell—is owned by GMP, which retains 55 MW of the project's output and sells the remaining 8 MW to VEC. Kingdom Community Wind has been subject to price reductions and often receives directions from ISO New England to curtail output. When this occurs, GMP loses the market value of the energy that could have been produced as well as associated renewable energy credits and federal production tax credits.

¶ 9. From March 2017 to February 2018, VEC's net power costs increased by $587,750 due to lower price revenues as the result of existing SHEI constraints. These increased costs resulted in upward pressure on retail electric prices paid by Vermont customers.

¶ 10. The SHEI also includes multiple small (i.e., less than 5 MW) hydroelectric, solar, and farm methane generators. These generators do not sell their output in the regional electricity

4

market, but instead operate as load reducers, reducing VEC's obligation to purchase electricity to match its customers' use.

¶ 11. As a net-metered system, applicant's proposed project would be a load reducer. The project would reduce the effective amount of demand for electricity within the SHEI area that is available to absorb local generation. During times of high local generation or low local electricity demand, the project would cause ISO New England to curtail some amount of output from existing renewable energy generators in the SHEI.

¶ 12. If the project had operated during March 2017 to February 2018, it would have resulted in additional curtailments of Kingdom Community Wind totaling 57 megawatt hours. That energy instead would be generated by applicant's project at the net-metering rate of $0.16919 per kilowatt hour, resulting in an additional annual cost to Vermont ratepayers of $9,692. In addition, Kingdom Community Wind would have lost approximately $612 in annual revenue, for a total annual cost to ratepayers of $10,304. Over the life of the project, the project would result in additional costs to ratepayers of more than $250,000. This estimate does not account for the utilities' loss of revenue from tax credits or impacts to other generation sources in the region, or for system upgrades that VEC may need to install to handle the additional power generated by the project.

¶ 13. There are currently no existing or planned transmission facilities that would resolve all of the existing SHEI constraints or the incremental constraints caused by the project. Fully resolving the congestion in the SHEI area would require an investment of several hundred million dollars to upgrade the major transmission lines.

¶ 14. Based on these findings, the PUC concluded that applicant's project could not be served economically by existing or planned transmission facilities without undue adverse effect on Vermont utilities or customers. See 30 V.S.A. § 248(b)(10). The PUC found that the addition of the project to the SHEI would increase existing transmission constraints and worsen the

5

resulting adverse effects on Vermont utilities and their customers. The parties agreed that the project would result in additional curtailments to the Kingdom Community Wind project and therefore increase costs to Vermont ratepayers, although they disagreed about how much the costs would be. The PUC found VEC's estimate of $250,000 over the life of the project to be more reasonable than applicant's lower estimate. The PUC agreed with the Department and the utilities that this additional adverse effect was "unacceptable" because the project would displace less expensive renewable electricity generation and the increased costs would be paid by ratepayers. Moreover, because the project would be net-metered, its own output would not be reduced during times when export constraints caused curtailments. The PUC concluded that the adverse effect on Vermont utilities and ratepayers was "undue" because the project would "provide no benefit to ratepayers relative to the less expensive renewable generation that is already available during times of curtailment." The PUC also stated that "[w]e find undue adverse effects here because, even if this [p]roject caused displacement only some of the time, even a small amount of displacement creates unnecessarily higher costs for Vermont utilities and customers."

¶ 15. The PUC also found that the project failed to satisfy § 248(b)(7) because it did not comply with the Vermont Comprehensive Energy Plan. Although the Plan calls for ten percent of Vermont's electricity to come from small renewable generators connected to Vermont's electric grid by 2032, it also seeks to place new generation close to demand to avoid costly transmission upgrades and states that Vermont should strive to achieve its renewable energy goals in a least-cost manner and to lower energy bills and electric rates. The PUC found that rather than reduce the need for transmission upgrades, applicant's proposed project would exacerbate the existing need by placing additional generation in a place where the system was already constrained. The project would be located in an area that already had a surplus of electricity. Further, the project would cause curtailments that displaced less expensive existing renewable energy and was therefore not a least-cost method for meeting the state's renewable energy goals.

6

¶ 16. Because the PUC concluded that § 248(b)(7) and (10) were not satisfied, it did not analyze whether the project met § 248(b)(4). It noted, however, that it disagreed with applicant's claim that the project satisfied criterion 4 based purely on the economic benefits of the project's construction and associated jobs and taxes because any positive economic benefits had to outweigh the negative impacts.

¶ 17. On appeal, applicant argues that the PUC violated the Administrative Procedure Act by not making findings regarding the economic benefits of the project, either as part of an analysis of § 248(b)(4) or in its discussion of (b)(7) and (10); ignored the plain language of § 248(a)(2)(B), which requires the PUC to consider whether the project will promote the good of the state; improperly considered testimony by a GMP witness that was not part of the prefiled testimony; improperly interpreted § 248(b)(10) by finding any adverse economic impact to be "undue" and failing to consider the fact that the utilities caused the current curtailment situation; applied an interpretation of § 248(b)(7) that was inconsistent with its prior decisions; and improperly required applicant to prove that the § 248(b) criteria were not unsatisfied. As discussed below, we conclude applicant's arguments are without merit.

¶ 18. When the PUC evaluates a CPG petition under 30 V.S.A. § 248, it "is engaged in a legislative, policy-making process." Auclair v. Vt. Elec. Power Co., 133 Vt. 22, 26, 329 A.2d 641, 644 (1974). "The [PUC] must exercise its discretion to weigh alternatives presented to it, utilizing its particular expertise and informed judgment." In re UPC Vt. Wind, LLC, 2009 VT 19, ¶ 2, 185 Vt. 296, 969 A.2d 144 (quotation omitted). Our review of the PUC's decision to issue or deny a CPG is therefore limited in scope. In re New Haven GLC Solar, LLC, 2017 VT 72, ¶ 14, 206 Vt. 49, 175 A.3d 1211. We will affirm the PUC's findings unless the appellant shows that they are clearly erroneous. In re Stowe Cady Hill Solar, LLC, 2018 VT 3, ¶ 20, 206 Vt. 430, 182 A.3d 53. Similarly, we defer to the PUC's interpretation of the statutes that it is charged with interpreting,

7

"though we do not abdicate our responsibility to examine a disputed statute independently and ultimately determine its meaning." Id. (quotation omitted).

I. Whether PUC Erred in Declining to Consider Overall Economic Benefit of Project

¶ 19. Applicant first argues that the PUC violated 3 V.S.A. § 812(a) by failing to make a ruling on applicant's proposed findings regarding the alleged economic benefit of the project.[2] Section 812(a) requires that in a contested case, "the decision shall include a ruling upon each proposed finding." "The purpose of this requirement is to make a clear statement to the litigants, and to this Court if an appeal is taken, of what was decided and how the decision was reached." Sec'y, Agency of Nat. Res. v. Upper Valley Reg'l Landfill Corp., 167 Vt. 228, 242, 705 A.2d 1001, 1009 (1997) (quotation omitted). Here, the PUC explained that it would not address whether the project would result in an economic benefit to the state under § 248(b)(4) because it found that the project did not meet § 248(b)(7) and (10). This was sufficient to explain to the litigants and this Court what was decided and how the decision was reached. Because all of the § 248(b) criteria must be satisfied for a CPG to issue, the PUC's finding that a project fails to satisfy one or more criteria is fatal to the project. Here, the PUC found that § 248(b)(7) and (10) were not satisfied, and there was no need for it to go on to address (b)(4).

¶ 20. Applicant argues that the project's alleged overall economic benefits are directly germane to § 248(b)(7) and (10) and should have been considered with respect to those criteria even if the conditional waiver of (b)(4) had not been rescinded. We disagree. Section 248(b) contains eleven separate criteria, each of which must be satisfied before a CPG may issue. The general economic benefit of a project to the state and its citizens is addressed under § 248(b)(4). See In re Green Mountain Power Corp., 2018 VT 97, ¶ 22, __ Vt. __, 198 A.3d 36 (explaining that

---

[2] Applicant alleged that the project would result in a total of over $1.1 million in economic benefits to Vermont, approximately $600,000 of which would be associated with constructing the project.

§ 248(b)(4) "relates to the general public"). This criterion is discrete from subsections (b)(7) and (10), which address more specific considerations, some of which are economic in nature. Subsection (b)(7) requires the PUC to find that the project complies with the Comprehensive Energy Plan, and (b)(10) requires it to consider whether the project can be served economically by the transmission grid without excessively impacting two subgroups of stakeholders—utilities and customers. Nothing in the language of the statute requires the PUC to consider the general economic benefit associated with the construction of the project in the form of jobs, taxes, and similar benefits in deciding whether § 248(b)(7) and (10) are satisfied. We therefore see no error in the PUC's decision not to consider such evidence in its findings under these criteria. See Cady Hill, 2018 VT 3, ¶ 20 (explaining that this Court generally will defer to PUC's interpretation of statute it is tasked with interpreting).

¶ 21. For the same reason, we reject applicant's claim that the PUC erred by failing to consider whether the project would promote the general good of the state and therefore violated 30 V.S.A § 248(a)(2)(B). Applicant argues that the PUC focused too narrowly on a limited set of adverse impacts and should have balanced those impacts against the project's broad economic benefits to Vermont as a whole. Again, we see no error. To issue a CPG, the PUC must find both that the project satisfies the criteria under § 248(b) and that it promotes the general good of the state. See UPC Vt. Wind, 2009 VT 19, ¶ 10 (explaining that predecessor to PUC properly issued CPG where it found that project, with conditions, satisfied all § 248(b) criteria and promoted general good of state). The PUC cannot issue a CPG to a project that does not satisfy all of the criteria under § 248(b). See 30 V.S.A. § 248(b) (providing that "[b]efore the Public Utility Commission issues a certificate of public good as required under subsection (a) of this section, it shall find" that (b)(1)-(11) are satisfied). It was unnecessary for the PUC to reach the "ultimate" question of whether the project would promote the general good of the State because the project failed to meet all of the prerequisite § 248(b) criteria. UPC Vt. Wind, 2009 VT 19, ¶ 7.

II. Whether the PUC's Consideration of GMP Expert Testimony Requires Reversal

¶ 22.    Applicant next claims that the PUC erred in considering certain testimony of a GMP expert in its decision.  At the hearing, the chairman of the PUC asked the GMP expert about the project's potential adverse impacts on energy prices paid to Vermont generators.  In response, the expert provided a general explanation of the impacts on GMP and estimated that between June 2016 and late 2017, SHEI constraints had cost GMP ratepayers "several million dollars."  The PUC made a similar finding to this effect in its decision and mentioned the finding as part of its discussion of § 248(b)(10).  Applicant argues that the information regarding the estimated costs to GMP ratepayers was not included in any of GMP's prefiled testimony and therefore violated the expert-witness prefiling requirements under Commission Rule 2.213 and Vermont Rule of Civil Procedure 26(b)(5).  Applicant argues that the PUC improperly relied on this information despite its statement specifically denying that it relied on the testimony in reaching its decision.[3]

¶ 23.    Commission Rule 2.213 requires parties to prefile testimony and exhibits of witnesses they intend to call.  See Public Utility Commission, Rules of Practice, § 2.213(A), Code of Vt. Rules 30 000 2000, http://www.lexisnexis.com/hottopics/codeofvtrules [hereinafter Practice Rules] ("Within such time as may be directed by the Commission, each party shall file the direct testimony and exhibits of each witness it proposes to call in support of its direct case.").  However, this rule is plainly intended to simplify complicated evidentiary hearings and not to entirely replace live testimony.  The language of the rule does not limit the PUC to considering only prefiled testimony.  See In re Green Mountain Power Corp., 2012 VT 89, ¶ 31, 192 Vt. 429, 60 A.3d 654 (affirming board's finding based on expert's testimony at hearing, which differed from his prefiled testimony).  Furthermore, Practice Rules § 2.215 explicitly permits the PUC to question any

---

[3] GMP argues that applicant failed to properly preserve this argument.  Although applicant did not object to the admission of the testimony during the hearing, it did raise the argument in its reply brief below, and the PUC addressed the issue in the decision denying the CPG.  We therefore consider the issue preserved for our review.

witness during a proceeding. See Practice Rules § 2.215(B) ("Any member of the Commission, and any member of its staff, may examine witnesses who testify in any proceeding."). That rule also contains no limit on the scope of permitted questioning or the use of such testimony as evidence. We are therefore unpersuaded by applicant's argument that the testimony violated PUC procedure.

¶ 24. Applicant also has not shown that it either requested the disputed information from GMP or any other party in interrogatories or sought a motion to compel. Thus, it has failed to establish a discovery violation under the Rules of Civil Procedure. Nor did the applicant request any other curative procedure, such as asking the PUC to keep the proceedings open for the limited purpose of presenting contrary or additional evidence on the issue.

¶ 25. Even assuming that it was improper for the PUC to consider the expert testimony, applicant has not demonstrated that the alleged error was prejudicial. See V.R.C.P. 61 ("The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."); Practice Rules § 2.220 (providing that Rule 61 applies to PUC proceedings). The PUC cited the "several million dollars" figure once as part of its general discussion of how current curtailments in the SHEI were already negatively impacting ratepayers and utilities.[4] It was undisputed that existing curtailments were financially impacting ratepayers, and the PUC noted that the parties disputed the exact amount of the impacts. The PUC did not directly compare GMP's estimated costs to the costs or benefits of the project. It expressly stated that it was not relying on the testimony in reaching its decision. There was ample other

_____

[4] In its brief, applicant overstates the number of times the PUC cited to the disputed testimony in its decision. The other two places where the PUC cited the GMP expert's testimony did not refer to the "several million dollars" language but instead to his more general testimony that GMP loses renewable energy and tax credits when exports are constrained in the SHEI. Applicant did not object to this testimony below.

evidence supporting the PUC's analysis of § 248(b)(10). Under these circumstances, we do not view its citation to the GMP expert's testimony as a reason to disturb the decision below.

### III. Whether the PUC Improperly Interpreted § 248(b)(10)

¶ 26.    Applicant contends that the PUC improperly interpreted § 248(b)(10) by finding that any adverse economic impact on utilities or customers would be undue. According to applicant, the estimated additional cost to ratepayers of $250,000 over the life of the project is not "undue" when compared with the alleged general economic benefit of the project.

¶ 27.    The PUC has not defined a standard for determining when the adverse effects of a project are "undue" under § 248(b)(10). Cf. UPC Vt. Wind, 2009 VT 19, ¶ 24 (explaining that in determining whether project will have undue adverse aesthetic impact under § 248(b)(5), PUC employs so-called Quechee test under which impact is undue if it violates clear written community standard, offends sensibilities of average person, or developer has failed to take reasonable mitigating steps). As we have recognized, any new energy project will likely have some adverse impacts, and "[t]hus there must be the qualitative measure represented by 'unduly,' a word often taken to be synonymous with 'excessively' or 'beyond a proper degree.' " Vt. Elec. Power Co. v. Bandel, 135 Vt. 141, 150, 375 A.2d 975, 981 (1977). However, "[t]he Legislature has put this weighing process in the hands of the Board. So long as it has exercised this authority in good faith, with adequate evidentiary basis, this Court will not intrude upon its decision." Id.

¶ 28.    We defer to the PUC's interpretation of § 248(b)(10). The PUC found that the adverse financial impact of this project was "undue" because it would displace cheaper existing renewable energy and provide no comparative benefit to utilities or ratepayers. Contrary to applicant's argument, the PUC's interpretation does not mean that any adverse economic impact to utilities or customers is always undue. Rather, the PUC determined that in this case the project's expected effect of increasing costs was excessive within the context of the existing generation and transmission system and the SHEI constraints. We understand the PUC to mean that a proposed

project could have some adverse economic impacts yet still satisfy (b)(10) if it provided a comparative benefit to utilities and ratepayers, such as replacing energy derived from polluting sources with clean renewable energy or increasing the reliability of the electrical system. Here, the adverse impacts were excessive because they would add to an overburdened system, increase costs to ratepayers, and offer no relative benefits such as providing cleaner or more reliable generation. The PUC's application of (b)(10) in this case is reasonable and supported by the evidence and we therefore decline to disturb it.[5]

¶ 29. Applicant also argues that the PUC should have considered the imprudent business decisions made by the utilities that allegedly created the curtailment situation in the SHEI. We disagree. Section 248 requires the PUC to analyze whether applicant's proposed project will promote the good of the State, taking the facts as they currently exist. The historical reasons for the curtailment situation in the SHEI are outside the scope of this proceeding.[6]

IV. Whether the PUC Misinterpreted § 248(b)(7)

¶ 30. Next, applicant argues that the PUC's interpretation of § 248(b)(7) in this case conflicts with past agency interpretations of the statute. It argues that the PUC has never

---

[5] Applicant argues that VEC's estimate of $250,000 in additional costs to ratepayers over the life of the project was unreasonably high because it was based on an overly conservative test year and contained many flaws. The PUC acted within its discretion in finding VEC's estimate to be credible. Similarly, the PUC was not required to credit applicant's testimony that allowing a new project to generate, even if it results in curtailment of existing generation, is likely a more economical solution than spending millions of dollars to eliminate curtailment entirely. See UPC Vt. Wind, 2009 VT 19, ¶ 21 ("It is for the [PUC], not this Court, to weigh the evidence and assess the credibility of witnesses.").

[6] The case cited by applicant in support of this argument is inapposite. In re Vermont Gas Systems, Inc. was an appeal from a ratemaking proceeding in which the utility sought to change its rate structure. We remanded for the PUC to engage in additional factfinding regarding the applicant's imprudently incurred costs, which would affect the rates paid by the utility's customers. 2018 VT 44, ¶ 25, __ Vt. __, 187 A.3d 1138. In this CPG proceeding, by contrast, the past business decisions of the potentially impacted utilities are not at issue. Analysis under § 248(b)(10) begins with the Vermont utility infrastructure as it currently exists.

13

previously denied a 500-kW net-metering project in VEC's service territory based on incompatibility with the Comprehensive Energy Plan, even though the SHEI curtailment area has existed for at least seven years. Applicant argues that every previous project installed in the SHEI has exacerbated the curtailment problem and resulted in displacement of other renewable energy resources, and that its project just happened to be at the head of the line when ISO New England amended its rules to apply curtailment to large renewable projects. Thus, applicant contends, the PUC's decision is erroneous because the PUC is treating similar projects differently. See Cady Hill, 2018 VT 3, ¶ 21 (explaining that we will find error when agency applies its regulations inconsistently).

¶ 31. Applicant has not identified any previous PUC decisions to support this contention.[7] Applicant therefore has failed to meet its burden of showing that the PUC has inconsistently applied § 248(b)(7). See UPC Vt. Wind, 2009 VT 19, ¶ 2 (explaining that appellant bears burden of demonstrating that PUC made erroneous findings or conclusions). Furthermore, an agency may depart from precedent if it provides a nonarbitrary reason for doing so. In re Apple Hill Solar, LLC, 2019 VT 64, ¶ 25, __ Vt. __, __ A.3d __. Here, the record shows that ISO New England's amendment of the Do-Not-Exceed dispatch rule in 2016 caused significant financial impacts on utilities and their customers. Projects proposed after the rule amendment therefore would have effects on curtailment and energy pricing that previous projects did not have. The PUC could consider these changed circumstances in assessing whether new applications complied with the Comprehensive Energy Plan. Compare id. (holding that PUC did not violate doctrine of precedent by deciding that town plan did not constitute a clear, written community standard despite reaching opposite conclusion in earlier proceeding because PUC could consider town's recent

_____

[7] Applicant's sole citation in support of this argument is to a motion filed by VEC in another case withdrawing its objection to a proposed 135-kW solar project in the SHEI. This is not a PUC decision and does not demonstrate that the PUC is treating similar projects differently.

application of plan), with <u>Cady Hill</u>, 2018 VT 3, ¶ 22 (reversing PUC's dismissal of application for failure to comply with completeness rules where PUC had treated previous nearly identical applications as complete).

## V.  Whether the PUC Engaged in Improper Burden Shifting

¶ 32.   Finally, applicant argues that it provided credible evidence to satisfy each of the § 248 criteria and that the other parties failed to rebut that evidence with evidence of their own. Thus, it argues, the PUC should have approved its petition.  Applicant concedes that it retained the ultimate burden of proof on all criteria, but nonetheless contends that the PUC's denial of its petition amounted to improper burden shifting because it required applicant to present additional evidence to rebut the other parties' evidence and thus prove a negative, i.e., that the § 248(b) criteria were not unsatisfied.

¶ 33.   We find no error.  The record shows that the other parties presented evidence to support their position that the project would not advance the goals of the Comprehensive Energy Plan and would cause undue adverse impacts on Vermont utilities and ratepayers.  Applicant essentially is arguing that the PUC should have accepted its version of the facts instead.  The PUC acted within its discretion in weighing the evidence, assessing the credibility of the witnesses, and determining that applicant had not met its burden of positive persuasion that criteria (b)(7) and (10) were satisfied based on all the evidence of record.  See <u>UPC Vt. Wind</u>, 2009 VT 19, ¶ 21 ("It is for the [PUC], not this Court, to weigh the evidence and assess the credibility of witnesses.").

<u>Affirmed</u>.

FOR THE COURT:

_____
Associate Justice

15