NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 3

No. 2019-398

| | |
|---|---|
| In re Petition of Acorn Energy Solar 2, LLC (Therese Holmes and Timothy Holmes, Appellants) | Supreme Court |
| | On Appeal from Public Utility Commission |
| | April Term, 2020 |

Anthony Z. Roisman, Chair

Cindy E. Hill of Hill Attorney PLLC, Middlebury, for Appellants.

Benjamin Marks of Benjamin Marks Attorney at Law PLC, Cornwall, for Appellee Acorn Energy Solar 2, LLC.

Alexander W. Wing, Special Counsel, Montpelier, for Appellee Vermont Department of Public Service.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen, JJ.

¶ 1. **CARROLL, J.** Therese and Timothy Holmes appeal a Public Utility Commission (PUC) decision granting Acorn Energy Solar 2 a certificate of public good (CPG) to build and operate a solar net-metering system. The Holmeses argue that the PUC erred in concluding that: Acorn's application was complete under the PUC Rules; several proposed changes constituted minor amendments; the project would be located on a preferred site; the project would comply with setback requirements; and the project would not have an undue adverse effect on aesthetics, orderly development, wetlands, air pollution, greenhouse gases, and traffic. We affirm.

## I. Legal Background

¶ 2. We begin with an overview of the relevant legal background. A net-metering "system is an electricity producing system of up to 500 kW powered by a renewable energy source that operates alongside an existing electricity distribution network." In re Stowe Cady Hill Solar, LLC, 2018 VT 3, ¶ 2, 206 Vt. 430, 182 A.3d 53. "A developer of a new electric-generation facility in Vermont may not begin construction until the PUC determines that the proposed project 'will promote the general good of the State and issues a certificate to that effect.' " In re Derby GLC Solar, LLC, 2019 VT 77, ¶ 2, __Vt. ___, 221 A.3d 777 (quoting 30 V.S.A. § 248(a)(2)(B)); accord In re SolarCity Corp., 2019 VT 23, ¶ 2, 210 Vt. 51, 210 A.3d 1255. "In deciding whether to grant a CPG, the PUC is directed by statute to consider various criteria." In re Green Mountain Power Corp., 2018 VT 97, ¶ 3, 208 Vt. 349, 198 A.3d 36.

¶ 3. As relevant to this appeal, the PUC must find that the "purchase, investment, or construction" of a project:

> (1) will not unduly interfere with the orderly development of the region with due consideration having been given to the recommendations of the municipal and regional planning commissions, the recommendations of the municipal legislative bodies, and the land conservation measures contained in the plan of an affected municipality. However:
>
> . . . .
>
> (B) With respect to a ground-mounted solar electric generation facility, the facility shall comply with the screening requirements of a municipal bylaw adopted under 24 V.S.A. § 4414(15) or a municipal ordinance adopted under 24 V.S.A. § 2291(28), and the recommendation of a municipality applying such a bylaw or ordinance . . . .
>
> . . . .
>
> (5) With respect to an in-state facility, will not have an undue adverse effect on aesthetics, historic sites, air and water purity, the natural environment, the use of natural resources, and the public health and safety, with due consideration having been given to the criteria specified in 10 V.S.A. §§ 1424a(d) and 6086(a)(1) through

(8) and (9)(K), impacts to primary agricultural soils as defined in 10 V.S.A. § 6001, and greenhouse gas impacts.

30 V.S.A. § 248(b). With that relevant background, we turn to the facts of this case.

## II. Facts and Procedural History

¶ 4. On August 15, 2017, Acorn filed an application with the PUC to build and operate a ground-mounted 150 kW solar net-metering system about two miles east of Lake Champlain in Shoreham, Vermont. To build the project, Acorn would lease approximately three acres on a forty-one-acre parcel. The parcel is an actively grazed farm pasture that contains several farm buildings. The nearest public road, Watch Point Road, runs along the northern edge of the parcel. There is an adjoining parcel to the east that also abuts Watch Point Road and contains a single-family home.

¶ 5. The leased area would include the project site, the construction staging area, and a temporary gravel access road. The project site would be located southeast of the actively grazed farm pasture, which would place the project about 385 feet to the south of the single-family home on the adjoining parcel and more than 500 feet from Watch Point Road. The site would have a ground-mounted solar array containing eight rows of panels. Building the solar array would require grading a ridge located on the project's west edge and removing four large maple trees. To access the site, Acorn would build a temporary gravel access road that would extend east and south from the existing driveway on the parcel. The construction staging area would be located north of the gravel access road.

¶ 6. Acorn provided prefiled testimony outlining how the proposed project would affect § 248(b) criteria, including the orderly development of the region, aesthetics, air and water purity, impacts to primary agricultural soils, wetlands, and soil erosion. On aesthetics, applying the so-called Quechee analysis, Acorn concluded that the project would have an adverse aesthetic impact because portions of the project would be visible to the west and north from public roads and a few private residences. See Construction and Operation of Net Metering Systems § 5.112(A), 30 Code

3

of Vt. Rules 30 000 5100 [hereinafter Rule 5.100], http://www.lexisnexis.com/hottopics/codeofvtrules (explaining that PUC applies the "so-called 'Quechee test' " to determine "whether a net-metering system satisfies the aesthetics criterion"). Acorn represented that the impact would not be undue, however, in part because the project would be "partially screened by a series of existing mature trees and structures." Acorn would further mitigate the impact by planting two maple trees to the north of the solar array—between the construction staging yard and the temporary gravel access road—and two just to the west of the solar array.

¶ 7.    With regard to effects on primary agricultural soils, Acorn attested that approximately 1.86 acres of primary agricultural soils would be impacted by the project, which would be "stripped, stored/covered, and replaced once the array is installed." According to the prefilled testimony, constructing the temporary gravel access road would have no impact on primary agricultural soils.

¶ 8.    In terms of impacts to wetlands, Acorn represented that no significant Class II wetlands or buffers exist within the project site. Acorn acknowledged, however, that there are two small Class III wetlands. Wetland B is .08 acres and located in a low-lying pasture on the west side of the project site. Wetland A is a 0.6-acre, isolated wetland located on the east side of the project site that is used as cow pasture. The two wetlands are separated by a fifteen-foot ridge that divides the drainage. Acorn concluded that the solar array would not have a large impact on the Class III wetlands because the project layout avoids "trench and fill impacts" on them.

¶ 9.    The Holmeses, who own property south of the project, filed notices of intervention and were granted party status.[1] They filed rebuttal testimony challenging Acorn's conclusions

---

[1] The Holmeses and several other adjoining landowners were jointly represented below. Because the Holmeses are the only adjoining landowners who appealed, we refer to the actions taken collectively by the adjoining landowners below as the Holmeses.

regarding several § 248(b) criteria, including orderly development, wetlands, and primary agricultural soils. Juli Hinds, a professional planner and member of the American Institute of Certified Planners, testified that the project would not promote the orderly development of the region because it did not meet the characteristics of a good site as defined in the Shoreham Town Plan and had characteristics of a bad site to the extent the project needs "to substantially excavate and modify the existing topography." Additional testimony was provided that grading the project site—which would involve lowering the ridge separating the Class III wetlands—could have a "profound impact" on the wetlands and subsurface evaluation was needed to assess the impact.

¶ 10. Almost a year after filing its initial application, Acorn proposed five changes to the project. First, primary agricultural soils disturbed during project construction would be stored on site in three berms. Two separate berms would be located along the eastern end of the project site and another at the southern end of the project. Second, overburden—material other than primary agricultural soil—would be stripped and "stockpiled immediately adjacent to the Project." Third, the solar array would be condensed, reducing the overall north-south dimension the array would take up. Fourth, the construction staging area would be moved west into the horse paddock on the host parcel. Finally, two maple trees—which were going to be planted to the west of the array— would be moved north into the horse paddock, just south of the construction staging area, so the trees would not interfere "with regular haying activities on the farm."

¶ 11. The Holmeses filed objections to the proposed changes and moved to dismiss Acorn's application, arguing that the proposed changes qualified as major amendments that required Acorn to refile its application. In response, Acorn withdrew the proposed changes and provided superseding proposed changes along with a motion for a minor amendment. The superseding proposed changes mirrored the original proposed changes with slight modifications. First, prime agricultural soils would be stored in two berms to the west—rather than to the east— of the project site, which would move the limits of disturbance by forty feet. An additional storage

5

berm would be located under the solar array.  Second, overburden would be stripped and—instead of being stockpiled adjacent to the project—disposed of off-site.  Third, the solar array would be condensed.  Finally, two maple trees would still be relocated a hundred-and-fifty feet to the north.[2]

¶ 12.  In the accompanying motion for a minor amendment, Acorn argued that the proposed changes qualified as minor amendments.  The Holmeses filed a second motion to dismiss arguing that the proposed changes comprised a major amendment because they would move the limits of disturbance by more than fifty feet and would likely have a significant impact under one or more of the applicable § 248 criteria.  In any event, they argued, Acorn's application was incomplete because it did not, among other things, identify the limits of disturbance or outline the impacts on vegetation and prime agricultural soils.

¶ 13.  An evidentiary hearing was held in September 2018 on three of the § 248(b) criteria: orderly development, aesthetics, and wetlands and primary agricultural soils.  As relevant here, Nils Behn, the project manager, testified that Acorn would haul away nearly 400 cubic yards of overburden and 500 cubic yards of soil to construct the temporary gravel access road, which was inconsistent with the prefiled testimony.  Jerry Matosky, owner and president of Trudell Consulting Engineers, also testified that approximately 500 cubic yards of soil would be removed to construct the temporary access road and the soil would be stored in the construction staging area.

¶ 14.  Following the hearing, the Holmeses filed a third motion to dismiss and a post-hearing brief.  The Holmeses argued that Acorn's application should be dismissed because the proposed changes—moving the two maple trees, creating berms to store the primary agricultural soils, excavating 500 cubic yards of soil to construct the temporary access road, and altering the

---

[2]  The superseding proposed changes made no reference to the construction staging area.  Because the initial proposed changes were withdrawn, the construction staging area would be located where it was originally outlined, which was north of the gravel access road extending from the driveway on the host parcel.

configuration of the solar array—constituted major amendments. Alternatively, the Holmeses argued that Acorn's application was incomplete because it did not, among other things, identify the limits of disturbance; include a drainage plan; or identify the extent of traffic, noise, and greenhouse gas emissions associated with constructing the project. On the merits, the Holmeses argued the PUC should not grant Acorn a CPG because the project would have an undue adverse impact on several § 248(b) criteria, including orderly development, aesthetics, primary agricultural soils, and wetlands.

¶ 15.    In a July 2019 decision, the PUC denied the motion to dismiss.[3] First, it concluded that Acorn's CPG application contained the required information. The PUC found that the application disclosed the limits of disturbance because the revised site plan accompanying the superseding proposed changes disclosed a "total disturbed area" of 1.71 acres, which included the gravel access road, solar array, soil berms, and square footage to be seeded and mulched. The PUC explained that the Holmeses' argument that the limits of disturbance had not been disclosed was based on the hearing testimony of Niles Behn and Jerry Matosky that 500 cubic yards of primary agricultural soils would be removed during construction of the access road. This testimony, however, was inconsistent with the revised site plan and Acorn's representation in its reply brief, which both indicated that no soils would be removed during construction of the road. Although the PUC acknowledged this inconsistency, it resolved it in favor of the site plan.

¶ 16.    In addition, interpreting PUC Rule 5.107(C)(5), the PUC determined that Acorn was not required to submit a drainage plan because its application "addressed drainage-related issues" and it was not proposing to drain any additional surface and/or subsurface water. Finally, because the PUC reconciled the testimony regarding construction of the access road in favor of

---

[3] A hearing officer first issued a proposal for a decision. The PUC then reviewed the proposal for decision and the parties' comments and adopted the hearing officer's recommendations and conclusions with clarifications and modifications.

the site plan, it concluded that the application—and additional information developed during discovery and the hearing process—contained sufficient information about traffic impacts and greenhouse gas emissions.

¶ 17. Second, the PUC concluded that the proposed changes qualified as minor amendments within the meaning of PUC Rule 5.103. The soil storage berms and adjustment of the solar array were minor amendments because they moved the limits of disturbance by less than fifty feet. The movement of the two maple trees, however, moved the limits of disturbance by more than fifty feet, which would qualify as a major amendment. Notwithstanding this fact, the PUC determined the movement of the trees qualified as a minor amendment because the new location provided an additional aesthetic benefit and proposing additional aesthetic mitigation constitutes a minor amendment.

¶ 18. Finally, the PUC found that the project would not have an undue adverse effect on the relevant § 248(b) criteria, including aesthetics, orderly development, air pollution, greenhouse gases, wetlands, water supply, and primary agricultural soils. It accordingly granted a CPG to Acorn. The Holmeses filed a motion to reconsider arguing that the PUC erred in (1) determining the proposed changes qualified as minor amendments; (2) finding the project would not have an undue adverse effect on soil and water supply without conducting subsurface hydrogeological evaluation; (3) finding that the project would not have an undue adverse effect on air pollution, greenhouse gases, and aesthetics; and (4) concluding that Acorn adequately considered alternative sites. The motion was denied, and the Holmeses appealed.

¶ 19. On appeal, the Holmeses argue the PUC erred in numerous ways. First, they argue the PUC erred in determining Acorn's application for a CPG was complete when it did not include a subsurface drainage plan and did not timely disclose the limits of disturbance. Second, the Holmeses argue that the PUC erred in determining the proposed changes—namely, relocating the two maple trees, moving soil offsite to construct the gravel access road, creating berms to store

8

primary agricultural soils, and reconfiguring the solar array—were minor amendments. Third, they contend the PUC erred in determining the project would be located on a preferred site and would meet setback requirements. Finally, the Holmeses claim that the PUC erred in finding the project would not have an undue adverse effect on aesthetics, orderly development, air pollution, greenhouse gases, wetlands, water supply, and traffic.

¶ 20. Acorn counterargues that the only proposed change that could qualify as a major amendment is the relocation of the two maple trees and submits that the PUC correctly interpreted its own rules to determine the change qualified as a minor amendment. In any event, Acorn argues, any error was harmless because the movement of the trees does not affect any of the Holmeses' substantial rights. With regard to the orderly development and aesthetics criteria, Acorn argues the PUC applied the correct legal standards and made factual findings that are supported by the record. Finally, Acorn argues that the Holmeses lack standing to challenge the PUC's conclusions that the project would be located on a preferred site; would not have an undue adverse effect on air pollution, greenhouse gas, and noise; and would comply with setback requirements.

¶ 21. The Department of Public Service (DPS) argues that the PUC reasonably interpreted its own rules to determine that a drainage plan is not required when a project does not plan to drain surface and/or subsurface water. Second, DPS argues that the PUC correctly determined that relocating the two maple trees was a minor amendment because Rule 5.103 gives the PUC discretion to determine whether aesthetic changes are minor. Third, DPS contends that the PUC correctly determined the project is located on a preferred site. Finally, DPS argues the PUC correctly found that the project would not have an undue adverse effect on aesthetics, orderly development, air pollution, and greenhouse gases.

III. Standard of Review

¶ 22. "When the PUC evaluates a CPG petition under 30 V.S.A. § 248, it is engaged in a legislative, policy-making process." In re Derby GLC Solar, LLC, 2019 VT 77, ¶ 18 (quotation

9

omitted). "Out of respect for the expertise and informed judgment of agencies, and in recognition of this Court's proper role in the separation of powers, we accord agency decisions substantial deference." In re Conservation Law Found., 2018 VT 42, ¶ 15, 207 Vt. 309, 188 A.3d 667. We employ a deferential standard of review to both an agency's "interpretation of [a] statute within its area of expertise," Shires Hous., Inc. v. Brown, 2017 VT 60, ¶ 9, 205 Vt. 186, 172 A.3d 1215, and "an agency's interpretation of its own regulations," Conservation Law Found. v. Burke, 162 Vt. 115, 121, 645 A.2d 495, 499 (1993).

¶ 23. Despite this deferential standard, "[w]e still conduct an independent review and will overturn an agency's interpretation of its own promulgated regulation that exceeds the authority granted under the state enabling statute, that conflicts with past agency interpretations of the same rule, that results in unjust, unreasonable or absurd consequences, or that demonstrates compelling indications of error." Conservation Law Found., 2018 VT 42, ¶ 16 (citations omitted) (quotations omitted). Similarly, we will overturn an agency's interpretation of a statute if there is a "compelling indication of an error" or if the interpretation is "unjust or unreasonable." Brown, 2017 VT 60, ¶ 9. The PUC's "findings will stand unless clearly erroneous; our role in reviewing the [PUC]'s findings and conclusions is neither to reweigh conflicting evidence nor reassess the credibility of witnesses." In re Vt. Gas Sys., Inc., 2018 VT 44, ¶ 15, 207 Vt. 324, 187 A.3d 113.

IV. Completeness of Application

¶ 24. The Holmeses argue that the PUC erred in determining that Acorn's application contained the information required by PUC Rules. "Rule 5.100 . . . sets forth the standards and procedures applicable to CPG applications for net-metering systems." In re LK Holdings, LLC, 2018 VT 109, ¶ 11, 209 Vt. 14, 201 A.3d 373. As relevant here, Rule 5.107(C)(5) provides that applications must (1) contain "[d]etailed plans for any drainage of surface and/or sub-surface water" and (2) outline "the limits of disturbance and the total acreage of any disturbed area."

10

"Failure to provide any required information will result in the application being deemed incomplete." Rule 5.100 § 5.107(C).

¶ 25. The Holmeses argue that the PUC erred in determining that Acorn's application contained the required information when it did not include a drainage plan or outline the limits of disturbance in a timely manner. We address each argument in turn.

### A. Drainage Plan

¶ 26. The PUC determined that Acorn's CPG application was administratively complete even though Acorn did not submit a drainage plan because, it reasoned, drainage plans are not required "if no drainage of surface or sub-surface water is proposed." Based on this interpretation, the PUC concluded that no drainage plan was required because Acorn addressed drainage issues, including how it would protect Class III wetlands and prevent erosion on the project site during construction, and did not propose any additional drainage of water.

¶ 27. The Holmeses argue the PUC impermissibly waived PUC Rule 5.107(C)(5)(e), which clearly requires a drainage plan.[4] DPS argues, however, that the PUC reasonably interpreted its own rules such that a drainage plan is not required when a project does not involve draining surface and/or subsurface water.

¶ 28. We agree with DPS that the PUC's interpretation of Rule 5.107(C)(5)(e) is reasonable. "Our primary goal in interpreting an administrative rule is to discern the intent of the drafters, and we so do by examining the plain meaning of the regulatory language, with other tools of construction should the plain meaning rule prove unavailing." Conservation Law Found., 2018 VT 42, ¶ 15 (quotation omitted) (alteration omitted). Rule 5.107(C)(5)(e) requires "[d]etailed

---

[4] The Holmeses also argue that the PUC erred in not requiring Acorn to submit a drainage plan because they presented a prima facie case that the project would harm their property by dewatering it. Although framed as a challenge to the PUC's interpretation of Rule 5.107(C)(5)(e), the Holmeses are challenging the PUC's finding that the project would not have an undue adverse effect on wetlands, water supply, or soil erosion. This argument is accordingly considered infra, ¶¶ 122-25.

11

plans for any drainage of surface and/or sub-surface water." The word "any" in this § acts as an adjective modifying "drainage." As an adjective, "any" is defined in part as "one or more—used to indicate an undetermined number or amount." Any, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/any [https://perma.cc/28WD-JHS5]. Based on the definition of "any," the PUC reasonably interpreted Rule 5.107(C)(5)(e) to require a drainage plan only to the extent drainage of surface and/or sub-surface water is proposed. As the PUC elaborated in denying the motion to reconsider, subsection 5.107(C)(5)(e), like other provisions of Rule 5.107(C)(5), only requires applicants to provide certain information when it is "applicable to a particular project."

## B. Limits of Disturbance

¶ 29. The PUC determined that Acorn's application adequately disclosed the limits of disturbance. The revised site plan, the PUC explained, outlined the total disturbed area, which included the gravel access road, solar array, soil storage berms, and area to be seeded and mulched. Although the PUC acknowledged conflicting information regarding whether Acorn would remove soil to construct the gravel access road, it resolved this inconsistency in favor of the site plan, which indicated that no soil would be removed.

¶ 30. The Holmeses argue that the PUC erred because Rule 5.107(C)(5) and 30 V.S.A. § 248(a)(4)(J) require Acorn to disclose the limits of disturbance at the beginning of the CPG process and Acorn did not disclose the limits of disturbance until it submitted the final revised site plan, which was more than a year after it filed the initial application. Section 248(a)(4)(J)(i) requires that applications for net-metering facilities delineate "the full limits of physical disturbance due to the construction and operation of the facility and related infrastructure, including areas disturbed due to the creation or modification of access roads and utility lines and the clearing or management of vegetation." The PUC is prohibited by statute from waiving or including "provisions that are less stringent" than § 248(a)(4)(J). Id. § 8010(c)(3)(E). Consistent

12

with § 248(a), Rule 5.107(C)(5)(d) requires that applications include a site plan disclosing "the limits of disturbance and the total acreage of any disturbed area." The Holmeses are correct that the initial application must identify the limits of disturbance.

¶ 31. What they overlook, however, is that Rule 5.108(A) outlines a process for making minor amendments to applications. It requires that applicants provide "notice of all minor amendments," which must have "sufficient information, including an amended site plan, so that the [PUC] can understand the nature of the proposed change and its impact." While applicants must initially disclose the limits of disturbance, Rule 5.108(A) anticipates that a pending application may be updated—and the limits of disturbance may change—in the course of proposing minor amendments.

¶ 32. In this case, Acorn complied with the relevant statutory and regulatory requirements. When Acorn initially filed its application, it included a site plan that delineated the full limits of disturbance. While the application was pending, Acorn proposed a minor amendment pursuant to Rule 5.108(A) and filed a revised site plan that, as the PUC found, outlined the total disturbed area, which included the gravel access road, solar array, soil storage berms, and area to be seeded and mulched. The PUC accordingly did not err in concluding that Acorn's CPG application adequately disclosed the full limits of disturbance.

## V. Amendments

¶ 33. The Holmeses argue that the proposed changes—excavating and moving soil off-site to build the temporary access road, creating berms to store primary agricultural soils, reconfiguring the solar array, and relocating the two maple trees—qualify as major amendments that required Acorn to refile its application. Acorn and DPS argue, however, that the only relevant metric for determining whether a change is minor or major is whether the limits of disturbance will be moved by more than fifty feet; as such, the only proposed change that could qualify as major is the relocation of the maple trees. Nevertheless, Acorn and DPS contend that the PUC

13

reasonably interpreted Rule 5.103 to determine that relocating the trees was a minor amendment because the new proposed location provided aesthetic mitigation.

¶ 34. Under PUC Rule 5.103, an amendment is either major or minor, which are defined as follows:

> (1) The following changes constitute a "major" amendment:
>
> (a) increasing the nameplate capacity of the net-metering system by more than 5% or reducing the nameplate capacity of the net-metering system by more than 60%;
>
> (b) moving the limits of disturbance by more than 50 feet;
>
> (c) changing the fuel source of the net-metering system; or
>
> (d) any other change that the [PUC], in its discretion, determines is likely to have a significant impact under one or more of the criteria of Section 248 applicable to the net-metering system.
>
> (2) The following changes constitute a "minor" amendment:
>
> (a) proposing additional aesthetic mitigation; or
>
> (b) any other change to the physical plans or design of the system that is not a major amendment.

If an amendment is considered major, the applicant must withdraw the application and refile. Rule 5.108(B). An applicant can implement proposed minor amendments, however, provided certain criteria are met. Rule 5.100 § 5.109(A).

¶ 35. Here, as an initial matter, the PUC found that Acorn would not be excavating agricultural soils to construct the temporary access road. Although during the evidentiary hearing Acorn's experts testified to removing 500 cubic yards of soils, the PUC resolved the inconsistency in favor of the revised site plan, and not the testimony, in part because it would result "in far less excavation and impact." The final CPG included a condition "specifying that the construction of the [p]roject and the areas of disturbance shall be in accordance with the final site plan

14

submitted . . . rather than any testimony provided." Based on this finding, the PUC concluded that there were no changes associated with constructing the access road.

¶ 36. The PUC concluded that the three proposed changes—soil storage berms, array adjustment, and relocation of the two maple trees—were minor amendments. The soil storage berms and array adjustment were minor amendments because they moved the limits of disturbance by less than fifty feet. Although the new proposed location for the two maple trees moved the limits of disturbance by more than fifty feet, the PUC concluded the change still qualified as a minor amendment because the new location would provide additional aesthetic mitigation and would not have a significant impact on any other § 248 criteria.

¶ 37. On appeal, the Holmeses argue the PUC erred in determining the proposed changes constituted minor amendments. First, with regard to the maple trees, the Holmeses argue that the purpose of moving the trees was not to provide additional aesthetic mitigation, and, in any event, citing previous PUC decisions, they posit that whether an amendment qualifies as minor or major "does not depend on the justification for the change." Second, the Holmeses argue the proposed changes increase the area of disturbance by over 50% and that it is unreasonable to consider an increase of this size a minor amendment.

A. Maple Trees

¶ 38. The Holmeses argue the PUC erred in determining that relocating the two maple trees was a minor amendment. As outlined above, "[w]e employ a deferential standard of review of an agency's interpretation of its own regulations." Burke, 162 Vt. at 121, 645 A.2d at 499. In this case, the PUC had to reconcile two conflicting parts of Rule 5.103. While moving the limits of disturbance by more than fifty feet qualifies as a major amendment under (1)(b), proposing additional aesthetic mitigation qualifies as a minor amendment under (2)(a). Reconciling these conflicting definitions, the PUC explained that "[w]hile Rule 5.103 generally defines changing the

15

limits of disturbance by more than 50 feet as a major amendment, the rule also creates an exception for changes related to adding aesthetic mitigation."

¶ 39. This interpretation of Rule 5.103, the PUC reasoned, would be "consistent with the [PUC]'s aesthetic mitigation rule, which contemplates evolving mitigation plans over the course of the CPG application process." Treating the relocation of aesthetic mitigation as a minor amendment would also encourage applicants to propose additional aesthetic mitigation "without worrying about triggering the major amendment requirements." The PUC's interpretation of Rule 5.103, specifically (1)(b) and (2)(a), is neither unreasonable nor does it "demonstrate[] compelling indications of error." Conservation Law Found., 2018 VT 42, ¶ 16 (quotations omitted).

¶ 40. The Holmeses argue, however, that this interpretation conflicts with past agency interpretations. See id. (explaining that we "will overturn an agency's interpretation of its own promulgated regulation . . . that conflicts with past agency interpretations of the same rule" (citation omitted)). The Holmeses argue the PUC has inconsistently interpreted Rule 5.103 because in In re Howe Center, Ltd., the PUC held that "the determination of whether a proposed change to the location of a project constitutes a minor or major amendment does not depend on the justification for the change." CPG No. 16-0083-NM, at 4 (Vt. Pub. Util. Comm'n July 24, 2017), https://epuc.vermont.gov/?q=node/104/27110.

¶ 41. In Howe Center, an applicant proposed changing a rooftop solar array to a ground-mounted system that would be located 200 feet to the south of the rooftop location. The PUC determined that the proposed change was a major amendment because it implicated § 248 criteria applicable to ground-mounted projects that the CPG application did not address, and the PUC did not consider in approving a rooftop system. Id. at 3-4. The PUC could not reach any definitive determination about the effect on § 248 criteria "without additional proceedings in accordance

with the applicable net-metering rule."[5] Id. at 4. Although the project would have "apparently satisf[ied] all applicable requirements of the Town of Rutland" and the mayor endorsed the project, the PUC explained that "the determination of whether a proposed change to the location of a project constitutes a major or minor amendment does not depend on the justification for the change or the fact that the proposed new location appears to be a good one." Id.

¶ 42.    In this case, consistent with Howe Center, the PUC did not rely on the justification for relocating the trees to determine the change qualified as a minor amendment. As the Holmeses observe, Acorn moved the maple trees to accommodate the landowner's request to relocate them so they would not interfere with haying. The PUC determined, however, that relocating the trees— which would, in effect, result in aesthetic mitigation—was a minor amendment based upon a reasonable construction of the criteria outlined in Rule 5.103 for determining whether a change constitutes a minor and major amendment. In sum, the PUC reasonably interpreted Rule 5.103 in a way that does not conflict with past agency interpretations.

### B.  Area of Disturbance

¶ 43.    The Holmeses argue the proposed changes qualify as a major amendment because they increase the area of disturbance by more than 50%. The PUC disagreed with the Holmeses' calculations and found that the proposed changes only increased the area of disturbance by 18%. In any event, the PUC concluded that Rule 5.103(1)(b) defines "major amendment in terms of changes to the limits of disturbance, not by changes in square footage."

¶ 44.    The Holmeses argue the PUC made a factual error in finding the proposed changes only increased the area of disturbance by 18%. Even assuming the proposed changes increased the area of disturbance by more than 50%, that would not qualify the changes as a major

---

[5]  The PUC also noted that the proposed change qualified as a major amendment because it moved the limits of disturbance by more than fifty feet but emphasized that the "principal basis" for its determination was (1)(d).

17

amendment. As the PUC explained, Rule 5.103(1)(b) does not define major amendment in terms of changes to the square footage of the disturbed area. Although the Holmeses argue that it is unreasonable to consider a change of this magnitude as a minor amendment, they cite nothing in Rule 5.103 indicating that an increase in the area of disturbance qualifies a change as a major amendment.

## VI. Preferred Site Status

¶ 45. The Holmeses argue that the PUC erred in determining the project would be located on a preferred site. Under PUC Rule 5.103, a preferred site is defined, in part, as "a specific location that is identified in a joint letter of support from the municipal legislative body and municipal and regional planning commissions in the community where the net-metering system will be located." The PUC concluded that the project would be located on a preferred site because it would be "on a site identified in letters of support from the Shoreham Select Board, the Shoreham Planning Commission [SPC], and the Addison County Regional Planning Commission."

¶ 46. The Holmeses argue that the letters of support were insufficient to confer preferred site status because the PUC rules require a single "joint letter" and the Shoreham Selectboard and Addison County Regional Planning Commission sent separate letters. Alternatively, the Holmeses argue that the letter from the Shoreham Selectboard is invalid because it was produced in violation of Vermont's Open Meeting Law. Acorn argues, however, that the Holmeses cannot challenge the PUC's preferred site determination because they were only granted intervention on three issues: orderly development, aesthetics, and wetlands and primary agricultural soils. Alternatively, Acorn argues that the Holmeses have no standing because whether the project is located on a preferred site only impacts the price of energy that the project will generate, which affects none of the Holmeses' legal interests.

¶ 47. The record indicates that the PUC's intervention order granted the Holmeses full party status. We conclude, however, that the Holmeses have no standing on the issue of preferred

18

site status because, as it pertains to the preferred site issue, we could not remedy the Holmeses' injury in fact by granting the requested relief.

## A. Intervention

¶ 48.　The PUC Rules outline several standards for those seeking to intervene in PUC proceedings.　First, under Rule 2.209(A), a person can intervene as a matter of right "when the [person] demonstrates a substantial interest which may be adversely affected by the outcome of the proceeding, where the proceeding affords the exclusive means by which the [person] can protect that interest and where the [person]'s interest is not adequately represented by existing parties."　Rules of Practice § 2.209(A), Code of Vt. Rules 30 000 2000 [hereinafter Rule 2.209], http://www.lexisnexis.com/hottopics/codeofvtrules.　Second, under Rule 2.209(B), a person may intervene in the PUC's discretion "when the [person] demonstrates a substantial interest which may be affected by the outcome of the proceeding."　Finally, in net-metering proceedings, several persons, including adjoining landowners, "will be granted party status . . . after filing a notice of intervention."　Rule 5.100 § 5.117(B)(3).

¶ 49.　In this case, after receiving notice that Acorn planned to submit a CPG application, the Holmeses filed a comment explaining that their "property is located south and uphill from the proposed project" and they had "numerous substantive concerns regarding the proposed project," including how the project would impact aesthetics, agricultural soils, and natural resources. Should Acorn file a CPG application, the Holmeses warned that they would "assert intervenor status to press" their concerns.　In November 2017, the Holmeses filed a notice of intervention. Acorn responded by requesting that the Holmeses be granted intervention only on the aesthetics criteria because that was the only issue in which they had "demonstrated a substantial, particularized interest not addressed by any other party in th[e] proceeding."

¶ 50.　In a March 14, 2018 order entitled "Order Re: Motion to Withdraw, Motion to Intervene, and Hearing Requests," the PUC granted the Holmeses party status pursuant to Rule

19

5.117(B)(3).  In doing so, the PUC specifically rejected Acorn's attempt to limit the Holmeses intervention to the aesthetics criteria, explaining that Acorn's intervention argument improperly relied on Rule 2.209(B).  In net-metering cases, the PUC explained, Rule 5.117(B)(3) governs, which "recognizes that adjoining landowners by definition have a substantial interest in net-metering cases whether under the standards for intervention described under . . . Rule 2.209(A) (intervention as of right) or 2.209(B) (permissive intervention)."  (Quotation omitted.)  The record indicates that the Holmeses were granted full party status.

¶ 51.    In arguing that the Holmeses were only granted intervention on three issues, Acorn confuses the PUC's intervention order with its order on the scope of the evidentiary hearing.  In its March 2018 order, the PUC granted the Holmeses party status and then addressed their request for an evidentiary hearing.  The PUC explained that pursuant to Rule 5.119, it would grant the Holmeses' hearing request if the request raised "(1) one or more substantive issues under the applicable Section 248 criteria; or (2) a substantive issue that [was] within the [PUC's] jurisdiction to resolve."  Even though the Holmeses requested a hearing on a host of issues, the PUC only granted an evidentiary hearing on three § 248(b) criteria: orderly development, aesthetics, and wetlands and primary agricultural soils.  Rather than limiting the Holmeses' intervention to three issues, the PUC merely limited the scope of the evidentiary hearing to those three issues.

### B.  Standing

¶ 52.    Acorn also argues that the Holmeses have no standing in regard to the preferred site issue because the preferred site designation does not affect any of the Holmeses' legal interests as adjoining landowners.  In other words, Acorn alleges that the Holmeses have not demonstrated an injury in fact.

¶ 53.    "Standing embodies a core constitutional component and a prudential component of self-imposed judicial limits."  Hinesburg Sand & Gravel Co. v. State, 166 Vt. 337, 341, 693 A.2d 1045, 1048 (1997).  To establish standing, a plaintiff "must show (1) injury in fact, (2)

20

causation, and (3) redressability." Brod v. Agency of Nat. Res., 2007 VT 87, ¶ 9, 182 Vt. 234, 936 A.2d 1286 (quotation omitted). In other words, "the plaintiff must allege a personal injury traceable to the defendant's conduct that the court can remedy by granting the sought-after relief." Brigham v. State, 2005 VT 105, ¶ 16, 179 Vt. 525, 889 A.2d 715 (mem.).

¶ 54. We agree that the Holmeses have no standing with regard to the preferred site issue; although, our rationale is slightly different. Pursuant to In re Apple Hill Solar LLC, 2019 VT 64, ___ Vt. ___, 219 A.3d 1295, we hold that the Holmeses have demonstrated an injury in fact. However, we could not remedy the injury in fact by granting the Holmeses' requested relief.

¶ 55. To demonstrate an injury in fact, a plaintiff must show they "have suffered . . . an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Turner v. Shumlin, 2017 VT 2, ¶ 11, 204 Vt. 78, 163 A.3d 1173 (quotation omitted). In Apple Hill Solar, LLC, we concluded that a grant of permissive intervention under Rule 2.209(B) was sufficient "to satisfy the constitutional injury requirement" because Rule 2.209(B) requires a determination that a party has "established substantial and particularized interests in the proceeding." 2019 VT 64, ¶ 19; see also Rule 2000 § 2.209(A) (explaining that "a person shall be permitted to intervene" as matter of right if they demonstrate, among other things, "a substantial interest which may be adversely affected by the outcome of the proceeding").

¶ 56. In this case, however, the Holmeses were granted party status pursuant to PUC Rule 5.117(B)(3)(f), which provides that an adjoining landowner will be granted party status "after filing a notice of intervention." Nevertheless, the PUC explained that Rule 5.117 "recognizes that adjoining landowners by definition have a substantial interest in net-metering cases whether under the standards for intervention described under . . . Rule 2.209(A) (intervention as of right) or 2.209(B) (permissive intervention)." (Quotation omitted.) Consistent with Apple Hill Solar LLC, the PUC's intervention order granting the Holmeses party status is sufficient to establish an injury

21

in fact because it "necessarily rested on a determination that [the Holmeses] had established substantial and particularized interests in the proceeding." 2019 VT 64, ¶ 19.

¶ 57.    To establish standing, the Holmeses must also show that the Court can remedy their injury in fact "by granting the sought-after relief." Brigham, 2005 VT 105, ¶ 16.  The relief the Holmeses seek is an order vacating Acorn's CPG or a remand "to the PUC for submission of evidence and hearing on the deficiencies."  Even if the PUC erred in concluding the project would be located on a preferred site, we could not remedy the Holmeses' injury in fact by granting the requested relief.

¶ 58.    A preferred site designation is relevant for two reasons: (1) determining if a project greater than 150 kW can be built and (2) calculating the price of energy that a net-metering system will produce.  First, projects greater than 150 kW must be built on a preferred site.  The PUC Rules provide that "[t]o be eligible to apply for a net-metering CPG . . . an applicant must propose" a Category I, Category II, Category III, or Category IV net-metering system, which are defined as follows:

> "Category I Net-Metering System" means a net-metering system that is not a hydroelectric facility and that has a capacity of 15 kW or less.
>
> "Category II Net-Metering System" means a net-metering system that is not a hydroelectric facility that has a capacity of more than 15 kW and less than or equal to 150 kW, and that is sited on a preferred site.
>
> "Category III Net-Metering System" means a net-metering system that is not a hydroelectric facility, that has a capacity of greater than 150 kW and less than or equal to 500 kW, and that is sited on a preferred site.
>
> "Category IV Net-Metering System" means a net-metering system that is not a hydroelectric facility, that has a capacity of greater than 15 kW and less than or equal to 150 kW, and that is not located on a preferred site.

Rule 5.100 § 5.103. The PUC Rules require that net-metering systems between 150 and 500 kW, Category III, be built on preferred sites. Systems between 15 and 150 kW, however, can be built either on a preferred site—in which case they are a Category II system—or not—in which case they are a Category IV system.

¶ 59. Second, a preferred site designation affects the price of energy that a net-metering system will produce. A net-metering system may produce more energy than a customer consumes. See Rule 5.100 § 5.103 (explaining that net-metering refers to "the process of measuring the difference between the electricity supplied to a customer and the electricity fed back by a net-metering system"); Rule 5.100 § 5.126(A)(2) (providing that customers can "elect to wire net-metering systems such that they offset consumption on the billing meter"). "If the electricity produced by the net-metering system exceeds the electricity consumed, the excess generation must be monetized at the applicable blended residential rate," which is expressed in dollars per kilowatt hour (kW/h). Rule 5.100 § 5.126(A)(2)(a)(ii); see also Rule 5.100 § 5.103 (defining blended residential rate). The blended residential rate may be increased or decreased "based on factors related to site selection." Rule 5.100 § 5.103. A net-metering system between 15 and 150 kW located on a preferred site is entitled to an increase of one cent per kW/h. Rule 5.100 § 5.127(C)(2)(b). On the other hand, the energy produced by a net-metering system of the same size not located on a preferred site is reduced by three cents per kW/h. Rule 5.100 § 5.127(C)(2)(d).

¶ 60. In this case, Acorn's project is a 150-kW system, which means that it can be built whether or not it is located on a preferred site. The preferred site designation is only relevant to determining the price of electricity the project would produce, specifically whether Acorn's project would be entitled to a siting adjustment of plus one cent per kW/h above the blended residential rate or would be reduced by three cents per kW/h below the residential rate. This issue has no bearing on the validity of Acorn's CPG, and its ultimate resolution will have no impact on the

Holmeses' injury in fact, which is based on how the project affects their adjoining property. Accordingly, even if the PUC erred in determining the project would be located on a preferred site, we could not remedy the Holmeses' injury in fact by granting the requested relief.

VII. Section 248 Criteria

¶ 61. The Holmeses argue that the PUC erred in finding that the project would not have an undue adverse effect on aesthetics, orderly development, air pollution, greenhouse gas impacts, transportation, water supply, and wetlands. As a threshold matter, however, Acorn argues that the Holmeses lack standing with regard to air pollution, greenhouse gases, and aesthetics, specifically construction noise.

A. Standing

¶ 62. Acorn argues that the Holmeses do not have standing because they were not granted intervention on, and have no legal interest in, the issues of air pollution, greenhouse gases, or construction noise the project will produce. To establish standing, a plaintiff "must show (1) injury in fact, (2) causation, and (3) redressability." Brod, 2007 VT 87, ¶ 9 (quotation omitted). As discussed above, supra, ¶¶ 48-56, the Holmeses were granted party status pursuant to Rule 5.117(B)(3)(f) because they are adjoining landowners. Under Apple Hill Solar LLC, 2019 VT 64, ¶ 19, this is sufficient to establish an injury in fact because, as the PUC explained, Rule 5.117 "recognizes that adjoining landowners by definition have a substantial interest in net-metering cases." (Quotation omitted.).

¶ 63. Whether the Holmeses have standing turns on the redressability prong. We concluded that the Holmeses did not have standing on the preferred site issue because even if the PUC erred in determining the project would be located on a preferred site, we could not remedy the Holmeses' injury in fact by granting the requested relief. By contrast, as it relates to air pollution, greenhouse gas, and aesthetics, we could remedy the Holmeses' injury in fact by granting the requested relief. Prior to issuing a CPG, the PUC must find that the "purchase,

24

investment, or construction" of a project will not have an undue adverse effect on air pollution, greenhouse gases, and aesthetics. 30 V.S.A. § 248(b)(5). If the PUC erred in finding the project would not have an undue adverse effect on air pollution, greenhouse gases, and aesthetics, it would directly affect the validity of Acorn's CPG and we could grant the requested relief—an order vacating the CPG.

¶ 64. Having concluded the Holmeses have standing, we address whether the PUC erred in finding the project would not have an undue adverse effect on aesthetics, orderly development, air pollution, greenhouse gas, transportation, and wetlands.

### B. Aesthetics

¶ 65. Before granting a CPG, the PUC must find that a project "will not have an undue adverse effect on aesthetics." Id. The Holmeses argue that the PUC erred in finding the project would not have an undue adverse effect on aesthetics. First, they argue the PUC committed legal error in concluding that Acorn took sufficient steps to mitigate the project's visual impact, including considering alternative sites. Second, they argue the PUC's findings regarding noise impacts were clearly erroneous.

### 1. Mitigating Steps

¶ 66. In determining whether a project has an undue adverse aesthetic effect, the PUC applies a modified version of the "so-called 'Quechee test' as described in the case In re Hanlon, 174 Vt. 515 (2002) (mem.)." Rule 5.100 § 5.112(A). The first step in that test is to determine "whether the project would have an adverse impact on aesthetics and the scenic and natural beauty of an area." Rule 5.100 § 5.112(A)(1). The project satisfies the aesthetics criteria if the answer is no. Id. If the project has an adverse impact, the next question is whether the impact would be undue. The impact is undue if (A) the project would "violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area"; (B) the project would "offend the sensibilities of the average person"; or (C) the applicant "failed to take generally

25

available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings." Rule 5.100 § 5.112(A)(2)(a)-(c).

¶ 67.   Pursuant to Quechee, the PUC found that the project would have "an adverse impact due to its proposed location in an open, rural setting and because it [would] be visible from surrounding public roads." In determining whether the impact was undue, the PUC first concluded that the Shoreham Town Plan's aesthetic guidelines did not provide any clear, written, community standards because they contain general siting criteria rather than designating specific areas for protection. Second, the PUC found that the project would not offend the sensibilities of the average person because the average person's view of the project from the north and west would be partially obscured by the soil storage berms and the agricultural structures on the host property. Although some open views remain from the north, the views would be broken by existing structures and the proposed vegetation.

¶ 68.   Finally, the PUC found that Acorn took sufficient measures to mitigate the adverse impact—namely, "large setbacks from public roads, planting two sugar maple trees to the north and two more to the northeast, and extending an existing cedar hedge on the host landowner's property." Although the Holmeses argued that Acorn was required to consider alternative sites for the project to mitigate its impacts, the PUC, citing several decisions from this Court, concluded that "[t]he burden of demonstrating that an alternative site is available is on the [opponent], not the Applicant." Applying this standard, the PUC concluded that the Holmeses failed to demonstrate that their proposed alternative site on the host parcel was available because the current proposed site was the only location the host landowner would allow on her property.

¶ 69.   On appeal, the Holmeses argue that the PUC improperly shifted the burden from Acorn to demonstrate the availability of an alternative site. Citing In re Halnon, 174 Vt. 514, 811 A.2d 161, they argue that it is Acorn's burden to show it considered alternative siting. Assuming the PUC applied the correct standard, the Holmeses argue that they presented evidence

26

demonstrating the availability of an alternative site because Acorn's lease did "not prescribe the limits of the lease area" and their expert identified a "specific, reasonable potential alternative site on the host parcel."

¶ 70. Before turning to the question of who has the burden of demonstrating the availability of an alternative site, we must decide a threshold question: Whether, in the context of a CPG proceeding, alternative siting in a project tract is a mitigating measure under Quechee. Although the Holmeses, Acorn, and DPS all assume that alternative siting is a mitigating measure, we have never expressly decided that question.

¶ 71. In Halnon, a landowner applied for a CPG to build a wind turbine net-metering system on a portion of his 62-acre property. The Public Service Board, the predecessor to the PUC, declined to issue a CPG because the landowner had not fully addressed the feasibility of other possible alternative locations on his property that would lessen the "offensive and shocking" aesthetics impacts of the project. Id. at 515, 811 A.2d at 162-63. We affirmed on appeal, explaining that the Board did not abuse its discretion in denying the CPG because the landowner did not consider alternative sites on his own property. Id. at 517-18, 811 A.2d at 165.

¶ 72. Almost a decade later in In re Rutland Renewable Energy, LLC, we clarified that we assumed in Halnon "that meeting the mitigation requirement could involve relocation of the wind turbine on the applicant's property without examining the issue." 2016 VT 50, ¶ 28 n.5, 202 Vt. 59, 147 A.3d 621. We reiterated that the issue was still open, see id., especially because in In re Goddard College Conditional Use, we explicitly declined to address whether, in the Act 250 context, "alternative siting within a project tract may be considered as a reasonable mitigating measure." 2014 VT 124, ¶ 11, 198 Vt. 85, 111 A.3d 1285

¶ 73. Although we have never decided if alternative siting is a mitigating measure under Quechee in the Act 250 context, there is an importance difference between applying Quechee in the Act 250 context and applying it in a CPG proceeding. In the Act 250 context, the Quechee test

27

is a judicial gloss on the aesthetics criteria under 10 V.S.A. § 6086(a)(8). See In re Application of Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 74, 199 Vt. 19, 121 A.3d 630 ("An analysis of a project's aesthetic impacts under Criterion 8 begins with the two-part Quechee test formulated by the Environmental Board . . . ."). By contrast, in the CPG context, the Legislature has directed the PUC to promulgate rules that, with respect to net-metering systems exceeding 150 kW, "apply the so-called 'Quechee' test" as described in Halnon to assess aesthetic impact. 30 V.S.A. § 8010(c)(3)(D).

¶ 74. Pursuant to this directive, the PUC promulgated Rule 5.112(A), which provides that "[i]n determining whether a net-metering system satisfies the aesthetics criterion contained in 30 V.S.A. § 248(b)(5), the [PUC] applies the so-called 'Quechee test' as described in the case In re Halnon." In interpreting this regulation, the PUC has clearly considered alternative siting an appropriate consideration. See Rutland Renewable Energy, LLC, 2016 VT 50, ¶ 56, n.11 (Reiber, J., dissenting) ("[T]here is no question that the [PUC] has considered [alternative sites] to be appropriate for consideration in CPG proceedings . . . ." (collecting cases)). Because we defer to both an agency's interpretation of a statute it has been charged with administering, Brown, 2017 VT 60, ¶ 9, and "an agency's interpretation of its own regulations," Burke, 162 Vt. at 121, 645 A.2d at 499, we defer to the PUC's interpretation that alternative siting is a mitigating measure in the CPG context.

¶ 75. Having determined that alternative siting is a mitigating measure under the PUC's interpretation of Quechee, the next issue is whether the PUC erred in determining that the burden of demonstrating the availability of an alternative site is on the opponents. It is true, as the Holmeses observe, that in Halnon, we held that the Public Service Board did not abuse its discretion in denying a CPG because the landowner did not consider alternative sites on his own property. 174 Vt. at 517-18, 811 A.2d at 165. However, we distinguished Halnon in Rutland Renewable Energy, LLC.

¶ 76. In <u>Rutland Renewable Energy, LLC.</u>, the Public Service Board granted Rutland Renewable Energy (RRE) a CPG to build a solar electrical facility "on approximately 15 acres of a larger parcel" that was under contract for purchase. 2016 VT 50, ¶ 2. We distinguished that case from <u>Halnon</u> because the issue presented was not "whether there [was] an alternative location on the property owned by RRE because the proposal already use[d] all the available land," and it was unreasonable to require RRE to demonstrate there was not a better alternative site on land it did "not own or control." <u>Id</u>. ¶ 27. Assuming "the evaluation of other properties [was] part of the <u>Quechee</u> test," we explained that "the initial burden to demonstrate an alternative site is on the opponents, not on the applicant." <u>Id</u>. ¶ 28.

¶ 77. <u>Rutland Renewable Energy</u> indicates that (1) applicants are not required to consider alternative siting on land they do not "own or control," and (2) "the initial burden to demonstrate an alternative site is on the opponents, not on the applicant." <u>Id</u>. ¶¶ 27-28. In light of <u>Halnon</u> and <u>Rutland Renewable Energy</u>, the PUC did not err in placing the burden on the Holmeses to demonstrate the availability of an alternative site on the host parcel.

¶ 78. Nor did the PUC err in concluding that the Holmeses failed to demonstrate their proposed alternative sites were available. Although the Holmeses identified an alternative site on the host parcel, the PUC concluded that the Holmeses did not meet their burden to demonstrate the site was "available" because the record indicated that "the current proposed site [was] the only location for the Project that the host landowner [would] allow on the host property." This finding is not clearly erroneous. Acorn's project manager testified that he did not consider alternative locations on the host parcel because "[t]he landowner was consulted during the lease negotiation" and his understanding was that there were "no other sites [the landowner] would be willing to site the array at."

¶ 79. The Holmeses also argue that the PUC's reasoning in this case is inconsistent with its order in <u>Application of Breezy Valley Community Solar Farm LLC</u>, CPG No. NM-6146 (Vt.

29

Pub. Util. Comm'n Aug. 10, 2015), https://epuc.vermont.gov/?q=node/104/37707. In that case, the issue was whether the applicant had taken sufficient mitigating steps, and the Town argued that additional screening was necessary. The applicant argued in response that it did not lease enough land for additional screening. The PUC, however, was unpersuaded by this argument because the applicant "selected both the size and location of the leased land" and could therefore accommodate additional screening by leasing additional land. Id. at 5. The PUC accordingly issued a CPG that included a condition requiring the applicant to file a revised site plan prior to construction that depicted additional visual mitigation. Id. at 8.

¶ 80. Breezy Valley is distinguishable in two respects. First, it did not address alternative siting but rather additional screening outside the leased area. Second, the PUC found in Breezy Valley that the applicant "selected both the size and location of the leased land," which meant that the applicant there could have gained control over more land to accommodate additional screening. That action was unavailable to Acorn, however, because the PUC found that the landowner would only lease a certain area.

2. Construction Noise

¶ 81. In determining whether a project will have an undue adverse effect on aesthetics, § 248(b) requires the PUC to give due consideration to the criteria specified in 10 V.S.A. § 6086(a)(1) through (8). Under § 6086(a)(8), aesthetics includes noise impacts. See In re N.E. Materials Grp., LLC/Rock of Ages Corp. Act 250 Permit, 2019 VT 55, ¶ 8, ___ Vt. ___, 217 A.3d 541 (recognizing that truck noise is an aesthetic concern under § 6086(a)(8)); Application of Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 74 (explaining that aesthetic impacts under § 6086(a)(8) include noise impacts).

¶ 82. The PUC found that any project-related sound impacts would not be undue because they would "be temporary during the eight-week construction period." The Holmeses argue that the PUC's findings about noise are clearly erroneous. They note that Acorn acknowledged for the

30

first time at oral argument before the PUC that it would be using jackhammers to eliminate bedrock at the project site and that eight weeks of jackhammering is a significant noise impact.

¶ 83. When understood in context, the PUC's findings regarding noise are not clearly erroneous. In November 2017, the Holmeses asked the PUC to conduct an evidentiary hearing on several § 248 criteria, including noise. The Holmeses argued that grading the project site would likely require moving bedrock, which the Holmeses alleged could not be accomplished with "ordinary grading equipment" and would instead require "blasting or drilling" that would create significant noise impacts. In their opposition, Acorn represented that no blasting would occur at the project site and therefore no hearing was required. In reply, the Holmeses requested a blasting prohibition be included as a condition in any CPG and that Acorn "disclose the duration of [the] site preparation, the machinery to be used, noise levels to be generated, and hours of operation."

¶ 84. The PUC declined to grant an evidentiary hearing on sound, concluding that the Holmeses had not raised a substantive issue. The PUC explained that, as a matter of practice, construction is limited to certain days and certain hours. Furthermore, the PUC noted that Acorn had already provided a construction schedule, which set out the following:

> Construction of the [p]roject will take approximately eight (8) weeks. During weeks one and two, vegetative management, grading, construction, staging area delineation, and procurement and delivering of major equipment will occur. During week three trenching will be dug and conduit will be run from the point of interconnection on the north portion of the [p]roject [p]arcel to the transformer and array area. Pile driving will take place during week four. The racking, modules, inverters, utility disconnect and meter, and transformer will be installed during weeks five through seven. During the eight and final week, wiring is run through the conduit and the [p]roject is commissioned.

¶ 85. In the final order granting the CPG, the PUC, to ensure sound impacts would not be undue, limited construction to 7:00 a.m. to 7:00 p.m. Monday through Friday and 8:00 a.m. to 5:00 p.m. on Saturdays with no construction allowed on Sundays or state or federal holidays. The Holmeses moved for reconsideration, requesting, in part, that the PUC add an additional "condition

31

prohibiting any percussive method of rock removal including ram hoes or jackhammers." The PUC denied the Holmeses' request, explaining that Acorn already agreed to prohibit blasting and finding that "any [p]roject-related sound impacts [would] be temporary during the eight-week construction period."

¶ 86. Considering the entire record, the PUC's findings regarding noise are not clearly erroneous. The Holmeses specifically raised concerns regarding blasting and the PUC incorporated a CPG condition prohibiting blasting. It is true that Acorn mentioned for the first time at oral argument before the PUC that when grading the project site, jackhammers would be used to remove bedrock. But the PUC found that the jackhammer noise would not be undue because it would be temporary. Although the Holmeses allege jackhammers would be used for eight weeks, this misconstrues the PUC's finding, which was that any project-related sound impacts would be temporary during the eight-week construction period. And according to Acorn's construction schedule, grading would occur during the first two weeks, which means that jackhammers would only be used for two weeks.

## C. Orderly Development

¶ 87. Prior to issuing a CPG, the PUC must find that a project "will not unduly interfere with the orderly development of the region." 30 V.S.A. § 248(b)(1). In making this finding, the PUC is required to give "due consideration" to the "recommendations of the municipal and regional planning commissions, the recommendations of the municipal legislative bodies, and the land conservation measures contained in the plan of an affected municipality." Id. "[S]ubstantial deference" must be given to "land conservation measures and specific policies contained in a duly adopted regional and municipal plan that has received an affirmative determination of energy compliance under 24 V.S.A. § 4352." 30 V.S.A. § 248(b)(1)(C). Finally, ground-mounted solar projects must "comply with the screening requirements of a municipal bylaw adopted under 24 V.S.A. § 4414(15) or a municipal ordinance adopted under 24 V.S.A. § 2291(28), and the

32

recommendation of a municipality applying such a bylaw or ordinance." 30 V.S.A. § 248(b)(1)(B).

¶ 88. In this case, the PUC found that the Shoreham Town Plan was neither a land conservation measure nor a screening requirement of a municipal ordinance or bylaw. It accordingly reasoned that in making its orderly development finding, pursuant to § 248(b)(1), it was only required to consider the recommendations of the municipal legislative body and municipal and regional planning commissions. Based on these considerations, the PUC found that the project would not interfere with the orderly development of the region in part because (1) the Shoreham Selectboard, SPC, and Addison County Regional Planning Commission provided letters supporting the project, and (2) evidence in the record supported the SPC's recommendation that the project complies with the Shoreham Town Plan.

¶ 89. On appeal, the Holmeses argue that the project interferes with the orderly development of the region because it does not comply with the siting requirements of the Shoreham Town Plan. In addition, the Holmeses argue that in making the orderly development finding, the PUC should not have relied on the letter of support from the Shoreham Selectboard and SPC because they did not comply with Vermont's Open Meeting Law at meetings where they discussed whether to support the project. Finally, the Holmeses argue that the letter of support is invalid because it constitutes an unauthorized act.

### 1. Town Plan

¶ 90. The Holmeses argue the project unduly interferes with the orderly development of the region because it does not meet the siting criteria contained in the Shoreham Town Plan. They specifically allege that the Town failed to comply with the Town Plan's mandate to "seriously consider the interests of adjoining landowners" and to ensure that the project is located on a "good site." Furthermore, the Holmeses point out that because the project is located on productive

agricultural farmland, the SPC was required to ensure that the host parcel would continue to be used for agricultural purposes, which the Holmeses allege the SPC failed to do.

¶ 91.    Although the PUC acknowledged that in certain cases it is required to independently review if a project complies with a town plan, it concluded that it was not required to do so here.  It reasoned that, pursuant to § 248(b)(1), it was only required to consider the recommendations of the Shoreham Selectboard, SPC, and Addison County Regional Planning Commission as to whether the project complied with the Shoreham Town Plan because the Town Plan did not contain land conservation measures and was not a screening requirement of a municipal ordinance or bylaw.

¶ 92.    We agree with the PUC that in some circumstances, it must determine whether a project complies with a town plan.  For example, in <u>Apple Hill Solar LLC</u>, we held that in determining whether a project will have an undue adverse aesthetic impact, the PUC is required to consider whether a project violates a clear, written community standard outlined in a town plan. 2019 VT 64, ¶¶ 33-36.  In this case, however, § 248(b)(1) does not directly require the PUC to determine whether a project complies with a town plan; instead, as the PUC correctly concluded, in making the orderly development finding, it must only consider compliance with town plans to the extent they qualify as land conservation measures or screening requirements of a municipal ordinance or bylaw.

¶ 93.    Although the Holmeses argue that the project does not comply with the Town Plan, they present no legal argument as to why the PUC should have independently evaluated whether the project complies with the siting criteria in the Town Plan.  In the absence of any argument that the Town Plan contains land conservation measures or is a screening requirement of a municipal bylaw or ordinance, we conclude that the PUC did not err in accepting the SPC's recommendation that the project complies with the Town Plan.

34

## 2. Open Meeting Law

¶ 94.    "Vermont's Open Meeting Law implements the command of Chapter I, Article 6 of the Vermont Constitution that officers of government are trustees and servants of the people and are at all times, in a legal way, accountable to them." Severson v. City of Burlington, 2019 VT 41, ¶ 12, ___ Vt. ___, 215 A.3d 102 (quotation omitted).  "It protects the interest of the public to hold its elected officers accountable by, among other ways, requiring meetings of a public body to be 'open to the public at all times,' except when in executive session, and by requiring that the public be given a 'reasonable opportunity to express its opinion' on matters being considered." Town of Brattleboro v. Garfield, 2006 VT 56, ¶ 16, 180 Vt. 190, 904 A.2d 1157 (first quoting 1 V.S.A. § 312(a); then quoting id. § 312(h)); see also 1 V.S.A. § 312(c)(1)-(2) (requiring "[t]he time and place of all regular meetings . . . be clearly designated" and "time, place, and purpose of a special meeting . . . be publicly announced at least 24 hours before the meeting"); id. § 312(d)(1) (requiring posting of meeting agenda "[a]t least 48 hours prior to a regular meeting, and at least 24 hours prior to a special meeting"); id. § 312(b)(2) (requiring meeting minutes to be "posted no later than five calendar days from the date of the meeting to a website, if one exists, that the public body maintains").  A public body includes "any board, council, or commission of the State or one or more of its political subdivisions." Id. § 310(4).

¶ 95.    On appeal, the Holmeses argue that the letter of support from the Shoreham Selectboard and SPC is invalid because both bodies did not comply with Vermont's Open Meeting Law at meetings where they discussed whether to support the project.  Before addressing the merits of this argument, we provide some additional factual background.  The record indicates the following.[6]  On October 17, 2016, Acorn presented their proposed project at an SPC meeting.

---

[6] Although the PUC addressed the merits of the Holmeses' Open Meeting Law allegations, it did not discuss or make specific findings regarding the various selectboard and SPC meetings underlying these allegations.  The factual background recounted infra, ¶¶ 95-101, is based on the record evidence and is relevant context to understanding the Holmeses' legal arguments on appeal.

According to the prefiled testimony of George Gross, a member of the SPC, at a November 14 meeting, the SPC discussed the merits of the project and voted to authorize a letter recommending the project to the PUC. On November 22, the SPC Chair emailed Greg Pahl, Acorn's President, to tell him that at the meeting the week before, the SPC voted to support the project. The next day, the SPC sent a letter to the selectboard explaining that after viewing Acorn's presentation about the project at their October meeting, they were recommending that the project go forward provided it complied with the Shoreham Town Plan.

¶ 96. The SPC Chair sent Pahl another email on January 19, 2017, explaining that the SPC could not designate the project location as a preferred site "at this time" because the SPC was "in the process of dealing with all the issues of Act 174 and [would] designate 'preferred siting' as a result of community input along with requirements of the Act." At a meeting that same day, the SPC discussed the Acorn project and concluded that the Town Plan would need to be amended to include preferred siting specifications. On February 16, however, the SPC met and discussed a recent change in the PUC Rules "that would potentially allow the project to move forward without having to specify 'preferred sites' in the town plan."[7] The minutes indicate that the SPC planned to discuss the project at the next meeting. However, on February 22, 2017—a day before the next SPC meeting—the selectboard and SPC Chairs sent a letter to Acorn expressing their support for the project provided it was "constructed in a manner consistent with the requirements of [the Shoreham] Town Plan."

---

[7] See Rule 5.100 § 5.103 (defining "preferred site," in part, as "[a] specific location designated in a duly adopted municipal plan under 24 V.S.A. chapter 117 for the siting of a renewable energy plant or specific type or size of renewable energy plant, provided that the plant meets the siting criteria recommended in the plan for the location; or a specific location that is identified in a joint letter of support from the municipal legislative body and municipal and regional planning commissions in the community where the net-metering system will be located").

¶ 97.   On January 3, 2018, the Holmeses sent a letter to the Shoreham Town Clerk alleging that recent selectboard and SPC meetings violated Open Meeting Law provisions.  The Holmeses alleged, among other things, that the November 21, 2016 and November 13, 2017 selectboard meetings violated 1 V.S.A. § 312(c) because they were not held in accordance with the Town's posted schedule.  The Holmeses also alleged that the minutes from the November 21, 2017 selectboard meeting were not posted to the town's website within five calendar days in violation of § 312(b)(2).  With regard to the SPC, the Holmeses alleged that the October 30 and November 20, 2017 meetings violated § 312(c).  The Holmeses requested that any business conducted at those meetings be voided and reconsidered at a future meeting and sought assurances that, moving forward, minutes would be posted within the five-day statutory time frame.

¶ 98.   On January 18, 2018—before either the SPC or selectboard responded to the Holmeses' Open Meeting Law allegations—Therese Holmes asked the selectboard to rescind the designation of the project location as a preferred solar site.  At a January 24 selectboard meeting, Therese Holmes read a second letter she had filed with the Town alleging additional Open Meeting Law violations, and she also alleged that a SPC member had a conflict of interest and should have recused himself from decisions related to the Acorn project.  She reiterated her demand that the selectboard rescind its support for the project.  The meeting minutes indicate that she agreed that the "question of rescinding support be on the agenda for a special meeting or the next regular [selectboard] meeting."

¶ 99.   At a January 29 special joint meeting, the selectboard and SPC responded to the Holmeses' allegations.  The selectboard acknowledged that its November 21, 2016 meeting violated § 312(c) because an agenda was not posted forty-eight hours in advance.  It also acknowledged that the minutes of its November 21, 2017 meeting were not posted to the Town's

website, in violation of § 312(b)(2). The selectboard announced that it planned to revisit the motions passed at the November 13 and 21, 2017 meetings at its next regular meeting.[8]

¶ 100. The SPC acknowledged that agendas had not been posted in advance of meetings and that minutes had not been posted to the Town's website as required by § 312(b)(2) and (d)(1)(A). It resolved to post minutes of meetings that occurred within the last twelve months as soon as possible and to timely post future minutes and agendas. The SPC also committed to reconsidering any formal resolutions taken since October 30, 2017.

¶ 101. At a February 12, 2018, meeting, the SPC reaffirmed its recommendation of support for the project.[9] On February 14, the selectboard similarly reconsidered and reaffirmed the motions passed at its November 13 and 21, 2017 meetings regarding hiring an attorney to represent the Town. In addition, the selectboard addressed Therese Holmes' January 18 and 24 requests that it rescind the preferred site designation and its support for the project. The selectboard affirmed its approval of the project, as outlined in its February 22, 2017 letter, and declined to rescind the preferred site designation because of the alleged conflict of interest on the part of the SPC.

¶ 102. Considering this history, the PUC found that the "Town of Shoreham acknowledged that the meetings at which the Shoreham Selectboard and [SPC] decided to support the project violated several requirements of the Open Meeting Law." Although the PUC noted that the Town's actions "left much to be desired," it concluded that the selectboard and SPC cured the Open Meeting Law violations, pursuant to the cure provision of § 314(b), by reconsidering and reaffirming their support for the project at the February 12 and 14 meetings. The PUC concluded

---

[8] The selectboard found it unnecessary to revisit the business conducted at the November 21, 2016 meeting because "[a]ny motions that might need reconsideration or ratification were minimal and ha[d] been made moot by the passage of time."

[9] At the February 12 meeting, the SPC also voted to intervene as a statutory party, to support the selectboard's decision to hire an attorney to represent the Town, and to post all meeting agendas and minutes in accordance with the Open Meeting Law.

38

that any further relief related to the Open Meeting Law violations had to be pursued in the superior court.

¶ 103. The Holmeses argue that the PUC erred in concluding the Town cured the Open Meeting Law violations because: (1) there was no evidence the selectboard cured the violations; (2) the cure occurred almost a year after the letter of support was issued; and (3) interested persons were not given an "opportunity to meaningfully participate in the Town's decision-making process prior to the Town's issuance of a letter of support."

¶ 104. Although we agree with the PUC that it could rely on the February 22, 2017 letter of support in making its orderly development finding, it failed to recognize the difference between ratifying an act and curing an Open Meeting Law violation pursuant to the cure provision of § 314(b). The selectboard and SPC ratified the February 2017 letter. They did not, however, cure the alleged Open Meeting Law violations. Although further relief related to the alleged Open Meeting Law violations may be available, the PUC correctly concluded that it was without jurisdiction to adjudicate Open Meeting Law violations.

a. Ratification

¶ 105. "As a general rule, whatever acts public officials may do or authorize to be done in the first instance may subsequently be adopted or ratified by them with the same effect as though properly done under previous authority." Valley Realty & Dev., Inc. v. Town of Hartford, 165 Vt. 463, 466, 685 A.2d 292, 294 (1996) (quotation omitted); see also, e.g., Stalbird v. Town of Washington, 106 Vt. 213, ___, 172 A. 623, 624 (1934) (holding that selectboard members have power to ratify if they act "in good faith and for the best interests of the town"); Town of New Haven v. Weston, 87 Vt. 7, ___, 86 A. 996, 1002 (1913) (explaining that, through power of ratification, selectboard could authorize treasurer to "borrow money for the town"). Public officials lack the power to ratify, however, when an action is "void by reason of noncompliance

39

with some mandatory provision of the law." Valley Realty & Dev., Inc., 165 Vt. at 466, 685 A.2d at 294 (quotation omitted).

¶ 106. In Valley Realty & Dev., Inc., we held that public officials could ratify actions taken in violation of the Open Meeting Law. Id. at 470, 685 A.2d at 295-96. In that case, the plaintiff brought an action against the Town of Hartford arguing that the selectboard violated the Open Meeting Law by "deciding to purchase a parcel of land in an illegal executive session" and sought to void the purchase. Id. at 463-64, 685 A.2d at 292-93. While his action was pending, the selectboard "voted in open session at a regularly scheduled meeting to ratify the purchase." Id. at 464, 685 A.2d at 293. The trial court held that the selectboard lacked the power to ratify because the purchase "was void for noncompliance with the open meeting law." Id. at 466, 685 A.2d at 294.

¶ 107. We disagreed and concluded that the exception to ratification did not apply to the Open Meeting Law because the Legislature did not intend to make "actions taken in violation of the open meeting law void and uncorrectable." Id. at 468, 685 A.2d at 295. The remedy provision, § 314, "does not provide that actions taken in violation of the law are void. Instead, it provides only for 'appropriate injunctive relief or for a declaratory judgment' at the request of the attorney general or a person aggrieved by the violation." Id. at 466, 685 A.2d at 294 (citation omitted) (first citing 1 V.S.A. § 314(a); then quoting id. § 314(b)). We also noted that the purpose of Open Meeting Laws is to "give public exposure to governmental decision-making," not to "create vehicles for individuals displeased with governmental action to obtain reversals of substantive decisions." Id. at 467-68, 685 A.2d at 295 (quotation omitted). "Although such reversals may sometimes be a side effect of open meeting law enforcement," invalidating "public action is often an 'extreme remedy' that may be inappropriate for the underlying violation." Id. (quoting Liebeskind v. Mayor & Mun. Council, 627 A.2d 677, 679 (N.J. Super. Ct. App. Div. 1993))).

40

"[A]llowing correction at a properly noticed public meeting," implements the "purposes of the law and minimize[s] undesirable consequences." Id. at 468, 685 A.2d at 295.

¶ 108. In 2014, the Legislature amended the Open Meeting Law by explicitly adding a "cure" process to the remedy provision, 1 V.S.A. § 314(b)(2)-(4). See 2013, No. 143 (Adj. Sess.), § 314. The remedy provision now provides that prior to instituting an action for Open Meeting Law violations, an aggrieved person or the attorney general must "provide the public body written notice that alleges a specific violation" and "requests a specific cure." 1 V.S.A. § 314(b)(1). Upon receiving written notice of an alleged violation, a "public body shall respond publicly to the alleged violation within 10 calendar days" by either acknowledging the violation and "stating an intent to cure" or stating "that no violation has occurred and that no cure is necessary." Id. § 314(b)(2). A public body can cure a violation by ratifying "any action taken at or resulting from" a meeting in violation of the Open Meeting Law at an open meeting and "adopting specific measures that actually prevent future violations." Id. § 314(b)(4). If a public body fails to respond to a written notice of an alleged violation within ten calendar days, however, it "shall be treated as a denial of the violation." Id. § 314(b)(3).

¶ 109. Here, the Selectboad and SPC both acknowledged that they failed to respond to the Holmeses letter alleging Open Meeting Law violations within ten calendar days as required by § 314(b)(2). They received the written notice on January 3, 2018 and did not respond until January 29. Section 314(b)(3) specifies that a failure to respond within ten calendar days "shall be treated as a denial of the violation," and a statement that no cure is necessary. As such, the selectboard and SPC cannot avail themselves of the cure process.

¶ 110. We conclude, however, that if a public body fails to comply with the cure provision in § 314(b), it is not precluded from ratifying acts taken in violation of the Open Meeting Law to ensure they are "effective and binding." Valley Realty & Dev., Inc., 165 Vt. at 468, 685 A.2d at 296. The statutory provision the selectboard and SPC failed to comply with, § 314(b)(2), is a

41

mandatory one. "This Court interprets the Legislature as having intended a mandatory time limit where the statute contains both an express requirement that an action be undertaken within a particular amount of time and a specified consequence for failure to comply with the time limit." Hartland Prop. LLC v. Town of Hartford, 2020 VT 56, ¶ 16, ___ Vt. ___, 237 A.3d 696 (quotation omitted). Section 314(b)(2) contains an express requirement that an action be undertaken within a particular time—the public body shall respond to written notice of an alleged violation within ten calendar days—and a specified consequence for failing to comply—failure to respond "shall be treated as denial of the violation" and a statement that no cure is necessary. 1 V.S.A. § 314(b)(2)-(3).

¶ 111. The cure provision, however, addresses only whether a public body is liable for attorney's fees and litigation costs; it does not determine whether a public act is effective and binding. Cf. In re A.A., 2020 VT 48, ¶ 13, __ Vt. ___, 236 A.3d 1287 (holding that, although statutory provision was mandatory, it was inapplicable to those particular proceedings). It expressly provides that a "public body will not be liable for attorney's fees and litigation costs" if it cures a violation. 1 V.S.A. § 314(b)(1); see also id. § 314(d) (providing that "court shall assess against a public body found to have violated the requirements of this subchapter reasonable attorney's fees and other litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed" unless the court finds that "the public body cured the violation"). By its plain text, the cure provision does not determine whether an action taken in violation of the Open Meeting Law is effective and binding; instead, it addresses whether a public body will be liable for attorney's fees and litigation costs if an aggrieved person or the attorney general brings an action.

¶ 112. It is certainly true that a step in the cure process is ratification at an open meeting. Id. § 314(b)(4)(A). There is no indication, however, that by adding the cure provision, the Legislature intended to overrule our conclusion in Valley Realty & Dev., Inc., that ratification at

42

an open meeting is sufficient, by itself, to ensure that actions taken in violation of the Open Meeting Law are "effective and binding." 165 Vt. at 468, 685 A.2d at 296. Despite adding the cure provision, the Legislature did not amend the ultimate remedy for an Open Meeting Law violation. Section 314(c) provides that, following the process outlined in § 314(b), an aggrieved person or the attorney general may bring an action for appropriate injunctive or declaratory relief. We relied upon this specific language in Valley Realty & Dev., Inc., to conclude that public bodies could ratify actions taken in violation of the Open Meeting Law. See 165 Vt. at 466, 685 A.2d at 294.

¶ 113. Here, even though the selectboard and SPC failed to comply with the cure provision, they ratified the February 2017 letter at subsequent open meetings. On February 12, the SPC reaffirmed its recommendation of support for the project. On February 14, the selectboard—in response to Therese Holmes' January 18 and 24 requests that it rescind the preferred site designation and its support for the project—affirmed its approval of the project. Because the selectboard and SPC ratified the February 2017 letter, it was effective and binding.

b. Jurisdiction

¶ 114. We also agree with the PUC that any further relief related to the Open Meeting Law violations had to be pursued in the superior court because it did not have jurisdiction to adjudicate Open Meeting Law violations. "We have repeatedly affirmed that public administrative bodies have only such adjudicatory jurisdiction as is conferred on them by statute, with nothing presumed in favor of their jurisdiction." In re Hinsdale Farm, 2004 VT 72, ¶ 10, 177 Vt. 115, 858 A.2d 249 (alteration omitted) (quotation omitted). "The Legislature has made it clear that administrative departments may exercise only those powers expressly conferred, and that authority cannot arise through implication." Id. (quotation omitted).

¶ 115. Section 314(c) of Title One makes clear that the PUC lacks authority to adjudicate Open Meeting Law violations. It provides that following an acknowledgment or denial of an Open

43

Meeting Law violation, "the Attorney General or any person aggrieved by a violation . . . may bring an action in the Civil Division of the Superior Court in the county in which the violation has taken place." 1 V.S.A. § 314(c). Section 314(c) specifies that the superior court, not the PUC, has "express authority to oversee violations of the Open Meeting Law provisions." Negotiations Comm. of Caledonia Cent. Supervisory Union v. Caledonia Cent. Educ. Ass'n, 2018 VT 18, ¶ 11 n.4, 206 Vt. 636, 184 A.3d 236.

¶ 116. This conclusion is consistent with our recent decision in In re Mountain Top Inn & Resort, JO 1-391, 2020 VT 57, ___ Vt. ___, 238 A.3d 637. In that case, we held that the Environmental Division has authority to invalidate agency regulations in the course of exercising its exclusive jurisdiction even though the Vermont Administrative Procedure Act creates a separate remedy for challenging agency regulations: a declaratory judgment action in the Civil Division of the Washington Superior Court. Id. ¶¶ 28-35. We concluded there was no evidence that by creating a separate scheme for challenging agency regulations, the Legislature intended to divest the Environmental Division of jurisdiction to invalidate agency regulations. Id. ¶ 34.

¶ 117. By contrast, here, we are addressing the scope of an agency's, rather a superior court's, jurisdiction. Whereas we determined that the Environmental Division's authority to invalidate regulations arose by implication from the statutory scheme, "[t]he Legislature has made it clear that administrative departments may exercise only those powers expressly conferred, and that authority cannot arise through implication." Hinsdale Farm, 2004 VT 72, ¶ 10. Jurisdiction is accordingly not "presumed in favor" of an agency's jurisdiction. Gloss v. Del. & Hudson R.R. Co., 135 Vt. 419, 422, 378 A.2d 507, 509 (1977). Nothing indicates that the Legislature conferred the PUC with jurisdiction to adjudicate Open Meeting Law violations, especially when § 314(c) expressly provides that such actions should be filed in superior court.

### 3. Unauthorized Act

¶ 118. The Holmeses alternatively argue that the February 22, 2017 letter was invalid because it was only signed by the selectboard and SPC Chairs, and 1 V.S.A. § 172 specifies that "[w]hen joint authority is given to three or more, the concurrence of a majority of such number shall be sufficient and shall be required in its exercise." The PUC concluded that the February 22, 2017 letter was valid because the selectboard and SPC ratified their support for the project at meetings in February 2018. We agree. As discussed <u>supra</u>, ¶ 113, regardless of whether the initial February 22, 2017 letter of support was signed by a majority, the selectboard and SPC ratified their support for the project at the February 2018 meetings.

### D. Air Pollution and Greenhouse Gas

¶ 119. Before granting a CPG, the PUC must find that a project will not have an undue adverse effect on air pollution. 30 V.S.A. § 248(b)(5). In making this finding, the PUC must give due consideration to greenhouse gas impacts. <u>Id</u>. Here, the PUC found that the project would not have an undue adverse effect on air pollution or greenhouse gas emissions because it would "not produce emissions while operating" and the emissions associated with construction would be "similar to other construction projects of comparable size."

¶ 120. On appeal, the Holmeses argue that the only evidence supporting the PUC's findings on greenhouse gas emissions is the testimony of Nils Behn, the project manager, that the emissions will be similar to those of other construction projects of comparable size. The Holmeses maintain that "[g]iven the substantial excavation, regrading, and carting off of materials inherent in th[e] project, this finding cannot be reasonably supported by the evidence." Although there is minimal evidence supporting the PUC's finding, it is not clearly erroneous.

¶ 121. During the evidentiary hearing, Behn testified that there would be no emissions associated with the operation of the project, and that although constructing the project would produce emissions in the form of truck traffic, the emissions would be similar to those of other

projects of comparable size. The Holmeses produced no other testimony on the matter and relied merely on speculation that the excavation, regrading, and moving of materials would produce undue impacts. Based on the record, the PUC's findings regarding greenhouse gas impacts are not clearly erroneous.

### E. Wetlands, Water Supply, Soil Erosion

¶ 122. Before granting a CPG, the PUC must find that a project will not have an undue adverse effect on the natural environment and the use of natural resources, giving due consideration to impacts on water supply, wetlands, and soil erosion. 30 V.S.A. § 248(b)(5). In this case, the PUC found that the project would not have an undue adverse effect on wetlands, water supply, or soil erosion. It determined that the two Class III wetlands on the project site were not of "particularly high value to the natural environment" and the Agency of Natural Resources and Army Corps of Engineers were not concerned with the project's impact on them. Nevertheless, the PUC found that Acorn had taken steps to protect the Class III wetlands, which included obtaining the necessary construction permits from the Department of Environmental Conservation and agreeing to "follow standard erosion prevention and sediment control construction techniques." The PUC also found that the project would not affect any existing water supplies as defined in 10 V.S.A. § 6086(a)(3). Although the Holmeses discussed a natural spring on their property during oral argument, the PUC found that the spring was not an existing water supply.

¶ 123. On appeal, the Holmeses argue that the PUC erred in finding the project would not have an undue adverse effect on wetlands and water supply because they presented credible expert testimony that grading the project site—specifically lowering the rock ridge separating the two Class III wetlands—would likely dewater a spring on their property that creates the wetlands. Furthermore, the Holmeses contend that the PUC erred in finding that the spring on their property

46

was not an existing water supply because they provided extensive testimony outlining how the spring provides economic, ecological, and agricultural value to their property.

¶ 124. Even assuming the spring on the Holmeses' property is an existing water supply within the meaning of 10 V.S.A. § 6086(a)(3), they have not demonstrated the PUC erred. The PUC was presented with conflicting evidence regarding how grading the project site would affect the Class III wetlands on the project site and the spring on the Holmeses' property. According to Acorn's expert, grading the site and lowering the rock ridge separating the two Class III wetlands would not impact the wetlands or the spring. The Holmeses' expert disagreed, testifying that wetlands are in their place because of interaction between the bedrock and groundwater discharge and that lowering the rock ridge could have a profound impact on the wetlands and the spring.

¶ 125. "It is for the [PUC], not this Court, to weigh the evidence and assess the credibility of witnesses." In re UPC Vt. Wind, LLC, 2009 VT 19, ¶ 21, 185 Vt. 296, 969 A.2d 144. Acknowledging conflicting evidence in the record, the PUC credited Acorn's expert witness, explaining that Acorn's expert testimony was based on tests performed at the project site and was consistent with the conclusions reached by the Agency of Natural Resources and the Army Corps of Engineers. By contrast, the Holmeses' expert did not visit the project site and characterized his testimony as a belief based on limited information. Thus, even assuming the spring qualifies as an existing water supply, the PUC did not err because it weighed the evidence and credited Acorn's witness.

### F. Transportation

¶ 126. The Holmeses argue that the PUC's findings regarding transportation effects are clearly erroneous. The PUC is required to consider whether a project will "cause unreasonable congestion or unsafe conditions with respect to use of the highways." 10 V.S.A. § 6086(a)(5). The PUC found that the project would not result in undue traffic or congestion because the project would only increase traffic for a short period of time and to a lesser extent than the traffic levels

the PUC has approved for other projects. Besides asserting the PUC erred, the Holmeses make no specific argument as to why these findings were clearly erroneous, and we conclude there was no error.

## VIII. Setbacks

¶ 127. Finally, the Holmeses argue that the PUC erred in granting the CPG because the project does not meet minimum setback requirements.[10] Section 248(s) of Title 30 sets minimum setback requirements that "apply to in-state ground-mounted solar electric generation facilities." The minimum setback requirements for a plant greater than 15 kW and less than or equal to 150 kW are forty feet from a state or municipal highway and twenty-five feet from "each property boundary that is not a [s]tate or municipal highway." Id. § 248(s)(1)(A)(ii), (B)(ii); Rule 5.100 § 5.113. Here, the PUC concluded that the project would meet minimum setback requirements because it would be "set back more than 40 feet from the nearest road and more than 25 feet from the nearest property boundary line." The PUC specifically found that the project would be set back from the surrounding property lines by the following distances: "270 feet (north), 166 feet (south), 50 feet (east), and 576 feet (west)."

¶ 128. The Holmeses argue that the PUC erred because the project's construction staging area does not meet the minimum fifty-foot setback requirement from the northern property boundary. There are numerous flaws with this argument. First, as noted above, for a 150-kW plant, the relevant setback requirement from a property boundary that is not a state or municipal highway is twenty-five feet, not fifty feet. Second, the Holmeses cite to a rendering of where the construction staging area would be located. They point to no evidence actually demonstrating that the construction staging area would not meet the twenty-five-foot setback requirement. Nevertheless, even assuming the construction staging area would violate the setback requirement,

---

[10] Acorn argues that the Holmeses do not have standing on the setback issue. For the reasons articulated, supra, ¶¶ 62-63, we conclude that the Holmeses have standing.

it is not subject to the setback requirement.  A setback is defined as the "shortest distance between the nearest portion of a solar panel or support structure for a solar panel, at its point of <u>attachment to ground</u>."  30 V.S.A. § 248(s)(4)(B) (emphasis added).

<u>Affirmed</u>.

FOR THE COURT:

Associate Justice

49